STATE OF CONNECTICUT *v.*
TYRONE MONTGOMERY
(SC 15880)

Borden, Norcott, Katz, Palmer and Sullivan, Js.

Argued January 13—officially released October 17, 2000

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Judith Rossi*, executive assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dennis O'Connor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Tyrone Montgomery, was charged with murder in violation of General Statutes § 53a-54a (a),[1] felony murder in violation of General Statutes § 53a-54c[2] and attempted murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a) (2).[3]

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . .

"(c) Murder is punishable as a class A felony . . . ."

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

The defendant also was charged under General Statutes § 53-202k[4] with using a firearm during the commission of a class A, B or C felony. A jury found the defendant guilty of murder and felony murder.[5] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a prison term of sixty years.[6] The court also determined, from the evidence presented at trial, that the defendant had used a firearm during the commission of the murder in violation of § 53-202k. Accordingly, the trial court, pursuant to § 53-202k, imposed a five year sentence to run consecutively to the defendant's sixty year sentence, for a total effective term of imprisonment of sixty-five years. On appeal,[7] the defendant claims that the trial court improperly: (1) denied his motion to suppress certain handwritten notes that were seized from his car; (2) permitted the state to introduce evidence regarding his

[1] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[5] The defendant was acquitted of attempted murder.

[6] The trial court properly sentenced the defendant on the murder count only. This procedure is in accordance with our holding in *State* v. *Chicano*, 216 Conn. 699, 709–10, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), in which we concluded that the proper disposition of a case involving multiple convictions for a single homicide is for the trial court to combine those convictions and sentence the defendant for one of them. Thus, in the present case, the court combined the defendant's murder and felony murder convictions and sentenced the defendant for the murder conviction only. Under this procedure, "[i]f the [defendant's] murder [conviction is] later invalidated for any reason and the defect at issue does not affect [his conviction for felony murder, that conviction] would be resuscitated and the defendant could be punished for [that conviction]." Id., 725.

[7] The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and what is now Practice Book § 65-1.

termination of a police interview prior to his arrest but after he had been advised of his *Miranda*[8] rights; (3) permitted the state to introduce into evidence the testimony of a mental health worker regarding a statement that the defendant had made, which, he claims, was protected by the psychiatrist-patient privilege; (4) quashed a subpoena duces tecum issued by the defendant without conducting an in camera inspection of the materials sought thereunder; (5) instructed the jury on reasonable doubt; (6) concluded that the evidence was sufficient to support his conviction for felony murder; and (7) failed to instruct the jury regarding the elements of § 53-202k. We reject these claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Gayle Isleib, resided at 863 Tolland Turnpike in Manchester with her husband, Douglas Isleib. The victim was employed by a local Wal-Mart store, where she worked in the shoe department. On April 30, 1996, the victim worked the evening shift. The victim's husband expected the victim to return home from work at approximately 10:15 p.m. that evening.

At about 10:50 p.m., the victim drove her Jeep Cherokee (Jeep) hurriedly into her driveway. The defendant followed her into the driveway in his white Mitsubishi Mirage. The defendant, who worked with the victim in the Wal-Mart shoe department, exited his car and approached the victim's Jeep, carrying a twenty-two caliber Norinco rifle. The victim activated the automatic garage door and sounded her car horn for several seconds. The defendant then fired seven shots at the victim, five of which struck her in the head, three from very close range. The victim also suffered defensive gunshot wounds to her left hand.

---

[8] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

After hearing the car horn and the gunshots, the victim's husband looked outside and saw the defendant standing next to the driver's side of the victim's car. The victim's husband immediately ran back inside to call 911. In the meantime, the defendant ran to his car, entered it and sped off. The victim's husband then went outside, where he found the victim unresponsive and slumped across the front seat of her Jeep. The victim died at the scene as a result of the bullet wounds to her head. Additional facts will be set forth as necessary.

I

The defendant first contends that he is entitled to a new trial because the trial court improperly denied his motion to suppress three handwritten notes seized from his car[9] in violation of the fourth amendment[10] to the United States constitution. We disagree.

The trial court conducted an evidentiary hearing on the defendant's motion to suppress at which the following relevant facts were established. On May 2, 1996,

[9] The defendant's motion to suppress also challenged the admissibility of other items seized from his car. The trial court denied the defendant's motion with respect to those other items as well. Only the seizure of the handwritten notes is at issue on appeal.

[10] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). The defendant also adverts to the state constitution in his analysis of this claim. The defendant, however, has not claimed that he is entitled to any greater protection under the state constitution than he is under the federal constitution. Accordingly, for purposes of this opinion, we treat the fourth amendment and the analogous state constitutional provision; Conn. Const., art. I, § 7; as embodying the same level of protection. See *State* v. *Copas*, 252 Conn. 318, 331 n.17, 746 A.2d 761 (2000).

officers of the Manchester police department obtained a search warrant for the defendant's impounded car.[11] In the course of executing the search warrant, the officers observed certain items that were not specifically mentioned therein, but which appeared to have evidentiary value, including a knife, an ice pick, duct tape, latex gloves, a cake dish and three handwritten notes. The notes were found in three separate locations in the defendant's car, namely, the glove compartment, an ashtray and under the front passenger seat.

Detective Joseph Amato of the Manchester police department found the first note in the front of the glove compartment as he opened the door to that compartment to search it.[12] After reading "[p]ortions" of the note, Amato concluded that it contained evidence relevant to the investigation and seized it.[13] Amato then observed a second note, torn and partially burned, in an ashtray located immediately to the right of the driver's seat and in close proximity to the automatic gear shift.[14] Amato did not attempt to read the note or remove

[11] The search warrant authorized the seizure of the following items: "Blood; semen; saliva; physiological fluids and secretions; hairs; fibers; clothing containing traces of those items; .22 caliber firearms—which includes [sic] pistols, rifles, or revolvers; projectiles; ammunition; bullet casings and fragments; dirt, dust, and soil; paint samples; glass and plastic fragments; and any and all items containing traces of any of the above mentioned articles . . . ."

[12] Amato testified that the note "was the first item [he saw when he opened] the glove [compartment]."

[13] The handwritten note provides: "Have Jay go in to Wal[d]baum's and buy something Write down numbers to phone bo[o]th and call him and tell him to pick you up at end of Slater Street Pretend like something is wrong with the car If you['re] not there then disas[s]emble gun and get rid of it and all clothes Go by Sports Authority and get stuff that make dog stop barking Dog muzzle"

[14] Because of its condition, only portions of this handwritten note are legible. Those portions provide: "[S]ix . . . 'Kidnap the next two days. Seven, have enough money to, you don't have to go in. Eight, bring insulin. Like a ham . . . husband . . . . If you try to . . . and grandkids your sis. This isn't a game. Also tell her about her . . . . Remember to tell her you always had to avoid you and it's time for . . . . You touch on him around she always to get close to him. Distance now you going to pay for. I'm going . . . . Nineteen, keep the thing Thursday, ask to go to the, my lunch but her.' "

it from the ashtray based on the note's condition. Instead, the police photographed the ashtray and its contents and removed the entire ashtray, including the note, from the car. Amato testified that he had seized the second note because of the likelihood that it contained trace evidence of the kind enumerated in the warrant. See footnote 11 of this opinion. The investigating officers also discovered a third handwritten note under the front passenger seat. Amato read portions of that note, but did not seize it at that time.

After seizing the first two notes, the police sought a second search warrant for the defendant's car. The application for the second warrant included the representation that, during the execution of the first warrant, several pieces of paper had been uncovered that contained information relating to a plan to kidnap the victim and to kill her husband.[15] The police obtained the second warrant, which authorized the seizure of, among other things, "handwritten notes and instructions; cutting instruments; icepicks; rubber gloves; duct tape, glass cake dish . . . [and] wom[e]n's clothing . . . ." The police then searched the defendant's car a second time and seized the third handwritten note that they had discovered under the front passenger seat while executing the first warrant.[16]

---

[15] The warrant application contained the following statements regarding the discovery of the notes: "[O]n May 2, 1996, the [first] search warrant was executed on the [defendant's] vehicle. During the course of this search several sheets of paper were uncovered with hand written notes. The notes talked of a kidnap plot by [the defendant] in which he was going to murder [the victim's husband] with an ice pick and then kidnap [the victim]. . . . [I]n the note, [the defendant] wrote that he would use the ruse of returning a cake dish in order to get into the house. Once inside, [the defendant] wrote that he would 'subdue him,' then kill him by putting an ice pick into his ear. . . . [The defendant] wrote about kidnapping [the victim] and added a reminder to bring insulin. It was known that [the victim] was a diabetic."

[16] This note provides in relevant part: "Monday get liquid latex white makeup

"Mustache

"Wear ladies shoes jacket

"Bag the [rifle] latex gloves Taking her jewelry

The defendant moved to suppress the notes discovered in the glove compartment and in the ashtray on the ground that the seizure thereof was not expressly authorized by the first search warrant.[17] The defendant also sought to suppress the handwritten note found under the front passenger seat notwithstanding that the second search warrant authorized the seizure of that particular note. Specifically, the defendant maintained that the seizure of the third note was unlawful because the probable cause upon which the seizure of that note was predicated derived solely from the information contained in the notes that allegedly were seized illegally from the glove compartment and the ashtray, and from the information gleaned by the police in reading the third note prior to obtaining the second warrant.

At the conclusion of the suppression hearing, the trial court rejected the defendant's motion to suppress the three handwritten notes. With respect to the note that the police had discovered in the ashtray, the trial court determined that its seizure was authorized under the first search warrant because it "could reasonably be [a receptacle] for just the type of trace materials and fluids

"Dogs bring mace and duct tape to tie up [dog's] mouth

"Have big brown knife in arm of jacket

"Have stun gun in bag handcuffs

"Find ope[ni]ng to garage because that's [where] she comes through

"Park car in Strawberries parking lot and walk down [and] come up with excus[e] like she left her insulin and [I'm] returning her cake dish She made a cake for me and my fiance You guys are invited to the wedding it's Oct[ober] 3

"Put clear scot[c]h tape around your fingertips Get fake beard and mustache Wear shades Buy a hat

"Excus[e] you want to buy the car Wipe down all weapons Get ice pick from grocery store Get him sub[dued]

"Then stick ice pick through his ear"

[17] The defendant did not claim, and he does not claim on appeal, that the police lacked the authority under the first warrant to search either the glove compartment or the ashtray. The defendant's sole claim is that the police improperly seized the two notes because the first search warrant did not expressly authorize their seizure.

listed as the object of the warrant . . . ." The court concluded that the police were authorized to seize the note found in the glove compartment under the plain view doctrine because that note had been discovered during the course of a lawful search and its evidentiary value was immediately discernible.[18] Finally, although the trial court did not expressly state its reason for refusing to suppress the note that had been discovered under the front passenger seat, the defendant's failure to establish that the second search warrant was the product of prior police misconduct necessarily was fatal to his claim with respect to that note.[19]

We first address the defendant's claim regarding the seizure of the note found in the ashtray. The fourth amendment to the federal constitution requires that search warrants describe with particularity the place to be searched and the persons or things to be seized. "The [particularity requirement of the fourth amendment] was a direct response to the evil of the general warrant, one of the abuses by the Crown that led to the American revolution: [T]he problem [posed by the general warrant] is not that of intrusion per se, but of a general exploratory rummaging in a person's belongings . . . . [The fourth amendment addressed the problem] by requiring a particular description of the things to be seized. *Andresen* v. *Maryland*, 427 U.S. 463, 480, 96 S. Ct. 2737, 2748, 49 L. Ed. 2d 627 (1976) . . . ."[20] (Citation omitted; internal quotation marks omitted.) *State* v. *Hamilton*, 214 Conn. 692, 706–707, 573 A.2d 1197, vacated on other grounds, 498 U.S. 933, 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990). "This requirement makes gen-

---

[18] The court also concluded that the police were authorized to seize the note found in the glove compartment because the note was a "possible receptacle for trace items or fluids listed in the warrant application."

[19] We note that the defendant did not seek an articulation of any aspect of the trial court's oral ruling on the motion to suppress.

[20] "General warrants, of course, are prohibited by the Fourth Amendment." *Andresen* v. *Maryland*, supra, 427 U.S. 480.

eral searches . . . impossible and prevents the seizure of one thing under a warrant describing another." (Internal quotation marks omitted.) *Andresen* v. *Maryland*, supra, 480.

However, "[t]he description of items to be seized in a warrant need only be as specific as the circumstances and the nature of the activity under investigation permit. *State* v. *Zarick*, [227 Conn. 207, 225, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993)]. In construing the terms of a warrant, the circumstances and nature of the activity under investigation dictate a practical margin of flexibility. *United States* v. *Lowry*, 675 F.2d 593, 595 (4th Cir. 1982). This principle, which applies in the law of the execution of warrants, is consistent with the concomitant principle, which applies in the law of the validity of warrants, that probable cause is to be determined based on the totality of the circumstances, viewed in a common sense and practical manner. *State* v. *Sivri*, [231 Conn. 115, 142, 646 A.2d 169 (1994)]. Furthermore, when police search for an item, they are entitled to search any container that logically could hold the item sought. *United States* v. *Gomez-Soto*, 723 F.2d 649, 655 (9th Cir.), cert. denied, 466 U.S. 977, 104 S. Ct. 2360, 80 L. Ed. 2d 831 (1984). In addition, the police do not exceed the scope of a warrant when they provide the issuing magistrate with the most particular description of the item sought that they reasonably can provide, and then seize only those items that fall generally within that description. See *United States* v. *Emmons*, 24 F.3d 1210, 1216 (10th Cir. 1994) ([w]hen the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking); *United States* v. *Harris*, 903 F.2d 770, 775 (10th Cir. 1990) (same)." *State* v. *Cobb*, 251 Conn. 285, 323, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). These

principles, as applied to the execution of the first warrant in the present case, compel the conclusion that the police acted well within permissible bounds in seizing the partially burnt note found in the ashtray. See id.

The defendant does not dispute that the first search warrant properly authorized the police to seize from his vehicle any and all items that the police reasonably believed were likely to contain traces of certain identified substances, including blood, saliva, physiological fluids and secretions, and glass and plastic fragments. Rather, the defendant claims that there was no reasonable likelihood that the note discovered in the ashtray contained traces of such substances. We disagree.

The police knew that the victim had been shot numerous times at close range, and that there was a considerable amount of blood spatter and broken glass at the crime scene. The police also had sound reason to believe that the defendant had shot and killed the victim, and that he had driven to and departed from the victim's home in his car. On the basis of this information, and in light of the close proximity of the ashtray to the driver's seat, it was reasonable for the police to believe that the defendant, while operating his vehicle, inadvertently transferred trace amounts of one or more of the substances identified in the warrant to the note found in the ashtray. In light of the almost impossible task of determining with specificity, prior to searching the defendant's vehicle, what items actually contained traces of the substances listed in the warrant, the warrant identified those items with as much particularity as reasonably could be expected. See id.; *State* v. *Zarick*, supra, 227 Conn. 225.

This is not to say, of course, that the police necessarily were authorized to seize anything and everything from the defendant's vehicle that conceivably could have contained trace evidence of the substances identi-

fied in the warrant, no matter how unlikely the discovery of such evidence might have been. The ashtray and its contents, however, including the note, were in such close proximity to the driver's seat and the gear shift that it was reasonably probable that the defendant came in contact with the note while operating the car, smoking a cigarette or disposing of something in the ashtray. Accordingly, the trial court did not improperly deny the defendant's motion to suppress with respect to the note discovered in the ashtray.

We next turn to the seizure of the note found in the glove compartment. As we stated with regard to the seizure of the note from the ashtray, "[t]he description of items to be seized in a warrant need only be as specific as the circumstances and the nature of the activity under investigation permit." *State* v. *Zarick*, supra, 227 Conn. 225. "Moreover, when the items that were seized were discovered during a lawful search authorized by a valid warrant [and when] they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence . . . the seizure [is] authorized by the plain-view doctrine. *Horton* v. *California*, 496 U.S. 128, 142, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). The police meet the immediately apparent requirement if, [up]on discovery, they have probable cause to associate the property in plain view with criminal activity without further investigation. *Arizona* v. *Hicks*, [480 U.S. 321, 324–27, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987)] . . . . In other words, objects not named in the warrant, but found within an officer's plain view, may be seized if the . . . officers had a reasonable basis for believing that the seized evidence was reasonably related to the offense which formed the basis for the search warrant. . . . This doctrine is based upon the premise that the police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search war-

rant or are otherwise entitled to be in a position to view the items seized." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, supra, 251 Conn. 346–47.

We conclude that the trial court properly determined that the seizure of the note found in the glove compartment was authorized under the plain view doctrine.[21] It is undisputed that the police were authorized to search the glove compartment. See footnote 17 of this opinion. While conducting that search, Amato came upon the note and conducted a lawful, cursory examination of it to ascertain its identity. Upon conducting such an examination, it was immediately apparent to Amato that the note contained evidence of criminal activity and he therefore seized it.

The defendant contends that Amato's cursory examination of the note constituted a separate and independent search and, consequently, that his examination of the note cannot be justified under the plain view doctrine. In support of this claim, the defendant relies on *Arizona* v. *Hicks*, supra, 480 U.S. 321.

In *Hicks*, police officers lawfully entered the respondent's apartment without a warrant under the exigent circumstances exception to the warrant requirement of the fourth amendment[22] to search for a murder suspect,

---

[21] Because we agree with the trial court that the seizure of the note found in the glove compartment was justified under the plain view doctrine, we need not address the state's contention that the trial court also properly determined that the note lawfully was seized as a possible receptacle for trace evidence.

[22] "It is a fundamental principle of search and seizure law [under the fourth amendment] that, in the absence of exigent circumstances and probable cause for arrest, a person's house may not be entered without a warrant, and that warrantless searches and seizures inside a house are presumptively unreasonable. . . . The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." (Citations omitted; internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995).

weapons and victims. See id., 323. Once inside the apartment, one of the officers observed two sets of stereo components that he believed had been stolen. Id. The officer then moved some of the components, including a turntable, to ascertain and record their serial numbers. Id. The officer called those numbers into police headquarters and, upon learning that the turntable, in fact, had been reported stolen, seized it immediately.[23] Id. The United States Supreme Court concluded that the officer's act of moving the equipment was "action . . . unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents . . . [and] produce[d] a new invasion of [the defendant's] privacy unjustified by the exigent circumstance that validated the entry." Id., 325. Therefore, the movement of the stereo equipment "constituted a search separate and apart from the search . . . that was the lawful objective of [that] entry." Id., 324–25. Because the officer, prior to moving the stereo components to ascertain their serial numbers, had only reasonable suspicion, and not probable cause, to believe that the equipment had been stolen, the court concluded that the search was unreasonable. See id., 328. Consequently, the court upheld the suppression of the turntable as a product of the unlawful search. Id., 329.

The defendant's reliance on *Hicks* is misplaced. As the court explained in *Hicks*, "[m]erely inspecting those parts of the turntable that came into view . . . would not have constituted an independent search, because it would have produced no additional invasion of [the respondent's] privacy interest." Id., 325. Thus, in *Hicks*,

---

[23] After seizing the turntable, the police learned that some of the serial numbers on the other equipment found in the apartment matched those of other stereo equipment that had been reported stolen. The police obtained and executed a search warrant for that equipment. *Arizona* v. *Hicks*, supra, 480 U.S. 323–24.

it would not have been improper for the officer to have read and recorded the serial numbers on the components if he would had been able to do so without moving those components to obtain access to the serial numbers. Thus, of critical importance for fourth amendment purposes is "the distinction between *looking* at a suspicious object in plain view and *moving* it even a few inches . . . ." (Emphasis added; internal quotation marks omitted.) Id.

In contrast to the officer's actions in *Hicks*, Amato's reading of portions of the note that he discovered in the glove compartment was not an additional invasion of the defendant's privacy rights. The note was in plain view when Amato came upon it in the glove compartment during the execution of a lawful search, and he was entitled to examine it to determine whether it contained evidence subject to seizure under the authority of the first search warrant. Upon commencing that examination, Amato immediately ascertained that the note contained other incriminating evidence, and, therefore, was justified in seizing it. See, e.g., *United States* v. *Escobar*, 805 F.2d 68, 70, 72 (2d Cir. 1986) (permissible for government agents executing arrest warrant at defendant's residence to seize papers in plain view that contained code words recognized as pertaining to drug conspiracy); *Daniels* v. *State*, 683 N.E.2d 557, 558 (Ind. 1997) (police executing search warrant properly seized calendar containing suspect's nickname under plain view doctrine); *State* v. *Andrei*, 574 A.2d 295, 296–98 (Me. 1990) (officer conducting lawful search properly examined four lines of diary that were in plain view); *Commonwealth* v. *D'Amour*, 428 Mass. 725, 730–32, 704 N.E.2d 1166 (1999) (police executing search warrant properly seized incriminating letter under plain view doctrine); see also *United States* v. *Menon*, 24 F.3d 550, 563 (3d Cir. 1994) (permissible for government agents to review documents "carefully enough" to determine

whether they were among class of documents subject to seizure under terms of search warrant). Consequently, the trial court properly denied the defendant's motion to suppress with respect to the note found in the glove compartment.

Finally, the defendant claims that the third handwritten note, which was discovered under the front passenger seat of the defendant's car, was seized unlawfully. He contends that, although the note was seized pursuant to the second search warrant, its seizure nevertheless was improper as a product, or "fruit," of the alleged, prior police illegality; see *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998) (under exclusionary rule, evidence will be suppressed if found to be product of prior unlawful police conduct); namely, the seizure of the first two notes and the reading of the third note prior to obtaining the second search warrant. As we concluded previously, however, the seizure of the first two notes was lawful. Consequently, the seizure of the third note pursuant to the second search warrant was constitutional. Accordingly, the defendant's claim regarding the third note also must fail.

II

The defendant also claims that the trial court improperly permitted the state to introduce evidence of his refusal to continue answering questions posed to him by the police prior to his arrest, but after he had been advised of his *Miranda* rights. The defendant contends that this impropriety constituted a violation of his rights under the fifth[24] and fourteenth[25] amendments to the

---

[24] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[25] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The fifth amendment privilege against self-incrimination is made applicable to the states by virtue of the fourteenth amendment due process clause. *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

United States constitution and, further, that the error was harmful, thereby entitling him to a new trial. Although we agree with the defendant that the state should not have been permitted to elicit testimony regarding his termination of the police interview, we nevertheless conclude that he is not entitled to a new trial because the impropriety was harmless beyond a reasonable doubt.[26]

The following facts are relevant to this claim. Several hours after the shooting, the defendant was admitted to Cedarcrest Hospital, a state psychiatric facility in Newington.[27] On the day of admission to Cedarcrest Hospital, Detective Paul Lombardo, along with Detective Sergeant Howard Beeler, both of the Manchester police department, interviewed the defendant for approximately thirty minutes in an office at Cedarcrest Hospital. At that time, the defendant was not in police custody and was free to leave the office at any time. Lombardo began the interview by reading the defendant his *Miranda* rights from a card issued by the Manchester police department. The defendant stated that he

---

[20] At trial, the defendant objected to the admissibility of his refusal to continue to answer questions, but did not couch his objection in constitutional terms. The defendant, therefore, seeks a new trial under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in which we held that a defendant can prevail on an unpreserved constitutional claim "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Although the record is adequate for our review of the defendant's constitutional claim, he cannot prevail under the fourth prong of *Golding* because the error was harmless beyond a reasonable doubt.

[27] The defendant initially went to the emergency room at Saint Francis Hospital and Medical Center in Hartford, where he was admitted. Soon thereafter, he was transferred to Cedarcrest Hospital.

understood his rights and agreed to speak with the detectives.

In response to Lombardo's questions, the defendant denied that he had killed the victim. The defendant admitted that he had purchased a twenty-two caliber rifle at Wal-Mart, but stated that he had sold it several days earlier to a person in Hartford. The defendant, however, was evasive in his response to Lombardo's questions regarding the identity of the person to whom he had sold the rifle and when he had done so. The defendant also admitted that, on one occasion, while riding with the victim in her car, he had placed a BB gun to her side and jokingly said, "[s]ee how easy it is for someone to hijack you." Thereafter, Lombardo asked the defendant whether the killing of the victim had been premeditated or a crime of passion. The defendant did not respond verbally to Lombardo's question, but tears welled up in his eyes, he began to shake and signaled for a nurse to terminate the interview. The police then asked the defendant no further questions.

The defendant contends that the testimony regarding his refusal to continue answering Lombardo's questions violated his right to due process under a line of cases beginning with *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).[28] "In *Doyle* . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding in two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important, it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no

---

[28] The defendant does not challenge the admissibility of the statements he had made to Lombardo prior to his termination of the interview.

penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. [Id.], 617–19. The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. Id., 292. Consistent with this rationale, the court has concluded that [the] use at trial of silence prior to the receipt of *Miranda* warnings does not violate due process. *Fletcher* v. *Weir*, 455 U.S. 603, [607] 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (postarrest silence); *Jenkins* v. *Anderson*, 447 U.S. 231, [240] 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (prearrest silence); see *Wainwright* v. *Greenfield*, supra, 291 n.6." *State* v. *Plourde*, 208 Conn. 455, 465–66, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989).

In *Plourde*, we concluded that "*Doyle* applies whenever *Miranda* warnings have been given regardless of an arrest or custody." Id., 466. As we stated in *Plourde*, "*Doyle* and subsequent cases have . . . made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires. *Wainwright* v. *Greenfield*, supra, [474 U.S.] 291; see *Greer* v. *Miller*, 483 U.S. 756, 763, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987). The unfairness of using a defendant's silence following

*Miranda* warnings is not mitigated by the absence of custody. *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. *Wainwright* v. *Greenfield*, supra, 291; *Fletcher* v. *Weir*, supra, [455 U.S.] 606; *Anderson* v. *Charles*, 447 U.S. 404, 407–408, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980). Custody is therefore not a prerequisite to a *Doyle* violation." (Citation omitted; internal quotation marks omitted.) *State* v. *Plourde*, supra, 208 Conn. 467; see also *State* v. *Canty*, 223 Conn. 703, 710, 613 A.2d 1287 (1992); *State* v. *Esposito*, 223 Conn. 299, 318–19, 613 A.2d 242 (1992). Furthermore, although *Doyle* prohibits *impeachment* of a defendant with evidence of his post-*Miranda* silence, we expressly stated in *Plourde* that it also is fundamentally unfair, and, therefore, a deprivation of due process, for the state to use evidence of a defendant's post-*Miranda* silence "*as affirmative proof at trial* . . . ." (Emphasis added.) *State* v. *Plourde*, supra, 468; see also *Wainwright* v. *Greenfield*, supra, 292 n.8 (noting that state's use of defendant's post-*Miranda* silence as affirmative proof in its case-in-chief gives rise to "constitutional violation [that] might . . . be especially egregious because, unlike *Doyle*, there [is] no risk that exclusion of the evidence [would] merely provide a shield for perjury" [internal quotation marks omitted]); *United States* v. *Szymaniak*, 934 F.2d 434, 439 (2d Cir. 1991) ("[i]t follows [from *Doyle*] that statements of a suspect's intent to remain silent [after he has been given *Miranda* warnings] are inadmissible in the government's case-in-chief").

This case is indistinguishable from *Plourde*. In *Plourde*, the police gave the defendant, Galen Plourde, who was a suspect in a murder investigation, *Miranda*

warnings even though he was not in custody. *State* v. *Plourde*, supra, 208 Conn. 464. In its case-in-chief, the state adduced evidence that the police thereafter asked Plourde if he wished to give a statement about the homicide. See id. Plourde responded that he was willing to listen to what the police had to say. Id. After the police had detailed for Plourde the evidence linking him to the crime, tears welled up in his eyes and he began to shake. Id., 464–65. Plourde indicated that he would give a statement to the police, but stated "that he wanted to call his lawyer [first] to see if he could get the best deal." (Internal quotation marks omitted.) Id., 465. We concluded that Plourde's conduct clearly demonstrated his intent to invoke his right to remain silent; id.; and that the state's use of Plourde's silence as evidence in its case-in-chief violated Plourde's right to due process under *Doyle* and its progeny. Id., 468.

In the present case, the police advised the defendant of his *Miranda* rights prior to interviewing him and prior to his arrest. Although the defendant initially responded to Lombardo's questions, he subsequently decided to stop answering questions and terminated the interview. There is no question that the defendant, in concluding the interview, was invoking his right to remain silent.[29] Consequently, the evidence adduced by

---

[29] The record does not reflect whether the defendant was expressly advised that, if he chose to answer questions, he had a right to stop doing so at any time. We note, however, that standard *Miranda* warnings generally contain such an advisement; see, e.g., *State* v. *Pinder*, 250 Conn. 385, 396 n.10, 736 A.2d 857 (1999) (defendant advised of right to stop answering questions at any time); *State* v. *Whitaker*, 215 Conn. 739, 743–44 n.4, 578 A.2d 1031 (1990) (same); *State* v. *Toste*, 198 Conn. 573, 577 n.4, 504 A.2d 1036 (1986) (same); *State* v. *Ferrell*, 191 Conn. 37, 40, 463 A.2d 573 (1983) (same); *State* v. *Staples*, 175 Conn. 398, 400, 399 A.2d 1269 (1978) (same); see also *Duckworth* v. *Eagan*, 492 U.S. 195, 202 n.4, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989) (standard *Miranda* warnings used by Federal Bureau of Investigation include statement that suspect has right to stop answering questions at any time); even though we have indicated that such an admonition, while desirable, is not constitutionally required. See *State* v. *Derrico*, 181 Conn. 151, 169, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Cobbs*, 164 Conn. 402, 418, 324 A.2d 234, cert. denied,

the state regarding the defendant's refusal to answer any further questions was fundamentally unfair and thus in violation of his rights under the fifth and fourteenth amendments to the United States constitution.[30]

414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973). As the United States Supreme Court has stated, however, *"Miranda* warnings protect [a defendant's privilege not to be compelled to be a witness against himself in any respect] by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, *or to discontinue talking at any time."* (Emphasis added.) *Colorado* v. *Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987); see also *Miranda* v. *Arizona*, *supra*, 384 U.S. 479 ("[A suspect in police custody] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Opportunity to exercise these rights must be afforded to him throughout the interrogation."* [Emphasis added.]). Consequently, even if the defendant was not expressly advised of his right to stop answering questions at any time, that right is implicit in any proper rendition of the *Miranda* warnings. Therefore, irrespective of the precise wording of the warnings given to the defendant, he was entitled to rely on the fact that his decision to terminate the interview with Lombardo could not be used against him by the state in a subsequent trial.

[30] The state contends that this case is distinguishable from *Plourde* because, in *Plourde*, the defendant refused to answer any questions, whereas in this case, the defendant agreed to be interviewed and responded to a number of Lombardo's questions before terminating the interview. In support of this contention, the state relies on *Anderson* v. *Charles*, *supra*, 447 U.S. 404, and a decision of this court, *State* v. *Casey*, 201 Conn. 174, 186, 513 A.2d 1183 (1986), that followed the holding of *Anderson* that *Doyle* does not apply to cross-examination of a defendant who, upon being given *Miranda* warnings, provides the police with one version of the facts and then, at trial, testifies to a different version. *Anderson* v. *Charles*, *supra*, 408 ("*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."); see *State* v. *Casey*, *supra*, 185 ("*Doyle* . . . is not applicable . . . [when] the defendant [does] not remain silent after he [is] arrested and advised of his rights"). Indeed, in such circumstances, it is permissible to cross-examine a defendant about details that he or she may have omitted from responses to police questioning because the defendant, having agreed

"*Doyle* violations are, however, subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . .

to speak with police about the subject matter of the crime, cannot later complain that he had failed to mention those details in the exercise of his fifth amendment right to remain silent. See, e.g., *State* v. *Casey*, supra, 186. *Anderson* and *Casey* are inapposite, however, because, unlike the defendants in those cases, the defendant in this case, after answering several questions, terminated his interview with Lombardo. Under *Anderson* and *Casey*, therefore, the state would have been free to cross-examine the defendant, if he had testified, regarding his responses to Lombardo's questions prior to his termination of the interview. Indeed, the state used those responses against the defendant in its case-in-chief, and the defendant has not challenged the propriety of the state's affirmative use of that evidence. See footnote 28 of this opinion. Under *Doyle*, however, the state was prohibited from eliciting testimony regarding the defendant's post-*Miranda* silence upon terminating the interview with *Lombardo*.

The state also suggests that Lombardo's testimony with respect to the defendant's refusal to answer any additional questions was admissible to show "the investigative effort made by the police and the sequence of events as they unfolded . . . ." (Internal quotation marks omitted.) *State* v. *Hull*, 210 Conn. 481, 490, 556 A.2d 154 (1989). It is true that we have allowed the use of evidence of a defendant's invocation of his fifth amendment right in certain limited and exceptional circumstances. See *State* v. *Casey*, supra, 201 Conn. 183; *State* v. *Moye*, 177 Conn. 487, 496, 418 A.2d 870, vacated on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129 (1979). We nevertheless have cautioned that "evidence of such an investigative effort must . . . be narrowly limited in light of *Doyle*." *State* v. *Hull*, supra, 490. We have stated, moreover, that "[s]uch evidence is impermissible if it was offered to impeach the testimony of the defendant in any way." Id., 491. It also is impermissible, therefore, to use such evidence affirmatively against an accused, as the state did in this case. It is undisputed that the state adduced evidence of the defendant's termination of his interview with Lombardo and the defendant's physical reaction to the question that apparently prompted him to do so, for the purpose of demonstrating the defendant's consciousness of guilt. Indeed, the nature and scope of the police investigation were not at issue in this case, at least with respect to Lombardo's interview of the defendant. Accordingly, we reject the state's claim that Lombardo's testimony regarding the defendant's termination of the interview was admissible as evidence of the investigative effort made by the police.

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . .

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard,* 231 Conn. 195, 211–13, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

We conclude that the *Doyle* violation in the present case was harmless beyond a reasonable doubt. The prosecutor did not attempt repeatedly to introduce evidence of the defendant's silence. Nor did the prosecutor mention that evidence during his closing argument. Instead, the prosecutor focused on the state's strong case against the defendant, including the incriminating

responses that the defendant gave to the police before terminating the interview with Lombardo.

Furthermore, the other evidence introduced by the state overwhelmingly demonstrated the defendant's guilt beyond a reasonable doubt. The victim's husband identified the defendant as the perpetrator, indicating that he was "100 percent" certain of his identification.[31] Prior to the murder, the defendant had told the manager of the shoe department at Wal-Mart that he was attracted to the victim and made statements of a sexual nature about her. In addition, the defendant frequently visited Wal-Mart on his days off so that he could be near the victim when she was working. On one occasion, the victim gave the defendant a ride home, and the defendant placed a BB gun to her side and told her that it would be easy for someone to "hijack" her. Moreover, in the months leading up to the murder, the defendant spoke to other Wal-Mart employees about killing someone and not getting caught.

The evidence also established that the defendant persuaded Salvatore Cavaliere, a manager in the sporting goods department at Wal-Mart, to place a special order for a .22 caliber Norinco rifle, a weapon that Wal-Mart generally did not carry. When the rifle arrived at the store approximately one week later, Cavaliere did not enter the gun into the store's inventory records and did not enter the sale of the rifle into the gun logbook when the defendant purchased it on April 26, 1996. In addition, the defendant did not use his employee discount number when he paid for the rifle, presumably to leave no indication of his identity on the cash register tape.

[31] Although most of the assailant's face was covered, at the time of the shooting, by a snug, white mask or white cream, the victim's husband had seen the defendant walk by the Isleibs' home nine days earlier wearing white facial makeup.

In addition, on the day before the murder, Cavaliere and a coworker ran into the defendant at a Circuit City store and observed that he had beige cream or lotion on his face that made his skin appear lighter. On that occasion, Cavaliere gave the defendant a ride to the corner of Slater Road and Tolland Turnpike, the location at which the victim resided.

The jury also heard evidence regarding the seizure of the three handwritten notes from the defendant's vehicle, all of which directly implicated the defendant in a kidnapping and murder plot. In addition, the police found other incriminating evidence in the defendant's car, including a knife, a can of Mace, latex gloves, duct tape and an ice pick. The state also adduced evidence that, during a search of the defendant's residence, the police found three, .22 caliber shell casings, beige makeup, a piece of paper containing the victim's social security number and an invoice, dated March 25, 1996, for a manual entitled "Hit Man."

Moreover, on August 24, 1996, the .22 caliber Norinco rifle that the defendant had purchased shortly before the shooting was recovered in Middletown.[32] A ballistics expert testified that the seven shell casings found at the murder scene all had been fired from that rifle. In addition, ballistics tests revealed that the three casings found by the police at the defendant's home also had been fired from that same rifle. Finally, the defendant, while incarcerated pending his trial, told a cellmate, Jeremiah Lopez, numerous details about the crime and the victim. Among other things, the defendant told Lopez that he had purchased the murder weapon at Wal-Mart, that he had shot the victim as she sat in her Jeep in the driveway of her home, that the victim's

---

[32] The recovered Norinco rifle bore the same serial number as the Norinco rifle that the defendant had purchased at Wal-Mart several days prior to the shooting.

husband came outside immediately after the shooting and that the police had seized notes from his car.

In light of the overwhelming evidence of the defendant's guilt, and in view of the fact that the objectionable testimony was not repeated and the fact that the prosecutor did not seek to capitalize on that testimony during closing arguments, we are satisfied that there is no reasonable possibility that the *Doyle* violation in this case affected the outcome of the defendant's trial. Accordingly, we conclude that the defendant cannot prevail under *Golding* and thus is not entitled to a new trial.

### III

The defendant next claims that the trial court improperly permitted the state to elicit testimony from a mental health worker regarding a statement that the defendant had made to a third party after he had been admitted to Cedarcrest Hospital. Specifically, the defendant contends that the state's use of that evidence was improper because the defendant's statement is protected from disclosure under the psychiatrist-patient privilege. General Statutes § 52-146d et seq.[33] We disagree.

[33] General Statutes § 52-146e provides: "Disclosure of communications. (a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any consent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

The following additional facts are necessary to our resolution of the defendant's claim. The defendant filed a motion in limine to preclude the testimony of Elaine Janas, a mental health assistant at Cedarcrest Hospital. The trial court conducted a hearing on the defendant's motion outside the presence of the jury. At the hearing, Janas testified that, pursuant to a psychiatrist's instructions, she was assigned to monitor the defendant on a

General Statutes § 52-146d provides: "Privileged communications between psychiatrist and patient. Definitions. As used in sections 52-146d to 52-146i, inclusive:

"(1) 'Authorized representative' means (A) a person empowered by a patient to assert the confidentiality of communications or records which are privileged under sections 52-146c to 52-146i, inclusive, or (B) if a patient is deceased, his personal representative or next of kin, or (C) if a patient is incompetent to assert or waive his privileges hereunder, (i) a guardian or conservator who has been or is appointed to act for the patient, or (ii) for the purpose of maintaining confidentiality until a guardian or conservator is appointed, the patient's nearest relative;

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative;

"(4) 'Identifiable' and 'identify a patient' refer to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records;

"(5) 'Mental health facility' includes any hospital, clinic, ward, psychiatrist's office or other facility, public or private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment of a patient's mental condition;

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

"one-to-one" basis on May 1, 1996, the day after the homicide. Pursuant to those instructions, Janas was to remain within "arm's length" of the defendant at all times and to take notes regarding the defendant's activities every fifteen minutes. Janas further testified that "one-to-one" supervision is ordered for a patient's protection, usually when that patient is suicidal.

Between 7 and 8 p.m., on the evening of May 1, the defendant made a series of telephone calls to people outside of the hospital while Janas was monitoring the defendant in accordance with the instructions she had been given. During one such telephone conversation, Janas overheard the defendant say to the party on the other end of the telephone line: "Don't forget I was with you last night."

The defendant claimed that Janas' testimony was barred by the psychiatrist-patient privilege. The state, which sought to use the defendant's statement as evidence of the defendant's attempt to concoct a false alibi, maintained that the statement did not fall within the scope of communications protected by that privilege. The trial court agreed with the state, concluding that the statement was not a protected communication for purposes of § 52-146d (2); see footnote 33 of this opinion; because it was in no way related to the defendant's diagnosis or treatment and because it was not a communication made to a psychiatrist or someone acting under the supervision of a psychiatrist who was engaged in the defendant's diagnosis or treatment. The trial court consequently denied the defendant's motion in limine, and Janas thereafter testified in the presence of the jury regarding the defendant's statement. On appeal, the defendant renews his claim that, because Janas was assigned by a psychiatrist to observe him and to record his behavior, anything that the defendant said within her earshot necessarily related to his diagnosis and treatment. We are not persuaded by this claim.

"[A]s with any claim of privilege, a statutory privilege has the effect of withholding relevant information from the factfinder . . . . Accordingly, although a statutory privilege must be applied so as to effectuate its purpose, it is to be applied cautiously and with circumspection because it impedes the truth-seeking function of the adjudicative process." (Citations omitted; internal quotations marks omitted.) *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 819, 742 A.2d 322 (1999). We previously have stated that the purpose of the psychiatrist-patient privilege is to safeguard "confidential communications or records of a patient seeking diagnosis and treatment"; (internal quotation marks omitted) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988); so as "to protect [the] therapeutic relationship." *Bieluch* v. *Bieluch*, 190 Conn. 813, 819, 462 A.2d 1060 (1983). It therefore is axiomatic that "[c]ommunications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible [under] the normal rules of evidence." Id.

Under General Statutes § 52-146e (a), all "communications and records as defined in section 52-146d shall be confidential" and, except in certain circumstances not applicable in this case, "no person may disclose or transmit any [such] communications and records or the substance or any part or any resume thereof . . . without the consent of the patient or his authorized representative." General Statutes § 52-146e (a). General Statutes § 52-146d (2) defines " '[c]ommunications and records' " as "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including

communications and records which occur in or are prepared at a mental health facility . . . ."

As the trial court concluded, the communication at issue was not between the defendant and a psychiatrist or Janas, but, rather, between the defendant and an unknown third party located outside of the hospital. Moreover, the defendant's instruction to that third party not to "forget [he] was with [the third party] last night" bore no relation to the defendant's diagnosis or treatment. The mere fact that Janas was assigned to observe the defendant for his own protection does not transform the defendant's statement into a protected communication under the psychiatrist-patient privilege. A contrary determination would extend that privilege well beyond the plain statutory language that defines it. Accordingly, we reject the defendant's claim that the trial court improperly permitted the state to elicit Janas' testimony regarding the defendant's statement.

## IV

The defendant next claims that the trial court improperly quashed a subpoena duces tecum issued by the defendant, seeking certain materials related to a lawsuit filed by the victim's husband and the victim's estate against Wal-Mart. The defendant asserts that the trial court's denial of his request that the court conduct an in camera review of those materials violated his rights under the compulsory process and confrontation clauses of the sixth amendment to the United States constitution.[34] This claim also is without merit.

The record reveals the following facts relevant to this issue. Subsequent to the victim's death, the victim's husband, acting as executor of the victim's estate, filed

[34] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor . . . ."

a lawsuit against Wal-Mart alleging that Wal-Mart had failed to follow proper procedures in its sale of the Norinco rifle that was used to shoot and kill the victim. The defendant issued a subpoena duces tecum to Richard Kenny, the attorney representing the victim's estate in that lawsuit, seeking all materials in Kenny's file regarding the lawsuit.[35] Kenny moved to quash the subpoena, claiming that the materials sought by the defendant were protected by the attorney-client privilege and the work product doctrine. In response, the defendant claimed that his "substantial need" for the materials "outweigh[ed] any claims that [the victim's husband] might have in protecting the confidentiality of his civil file . . . ." The defendant then requested that the trial court conduct an in camera review of Kenny's file to determine whether it contained any materials that would be subject to disclosure. The trial court granted the motion to quash, concluding that the subpoena was "overly broad" and, further, that the defendant had failed to demonstrate a need sufficient to warrant the "fishing expedition" that an in camera review of Kenny's file necessarily would entail. The court, however, indicated that it would reconsider its ruling if the defendant thereafter made a more "specific and precise" request regarding materials in Kenny's possession that the defendant had reason to believe were necessary to the preparation of his defense.

On appeal, the defendant challenges the trial court's refusal to conduct an in camera review of the materials in Kenny's file. Specifically, the defendant claims that such a review was required because it could have led to the discovery of information, such as inconsistent statements or other evidence tending to exculpate the

---

[35] The subpoena sought production of the following materials: "Any and all reports, documents, statements, photographs, videotapes [and] investigator['s] reports associated with a certain civil action entitled Douglas Isleib, Executor of the [E]state of [Gayle] Isleib [v.] Walmart Inc., pending in the Judicial District of Tolland."

defendant, that would be critical to his defense.[36] The defendant therefore asserts that we should remand the case to the trial court for an in camera review of Kenny's file.[37] The state counters that the trial court properly exercised its discretion in granting the motion to quash. We are not persuaded by the defendant's claim.

The defendant failed to specify the information likely to have been in Kenny's file that would have aided the defendant in presenting his defense or in cross-examining one or more of the state's witnesses. Rather,

[36] As we recently reiterated, "[t]he sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . Although we recognize that the right of a defendant to present a defense is subject to appropriate supervision by the trial court in accordance with established rules of procedure and evidence . . . we are also mindful that the fair opportunity to establish a defense is a fundamental element of due process . . . and that our rules should not be applied mechanistically so as to restrict unreasonably that important right. . . .

"Furthermore, [t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 256–57, 745 A.2d 800 (2000).

[37] Should we remand the case for an in camera review of Kenny's file, the defendant acknowledges that, if it is determined that the file contains no documents or materials to which the defendant is entitled, then the trial court's failure to conduct such a review at the time of trial would be harmless error. On the other hand, if an in camera inspection of that file were to disclose materials to which the defendant was entitled, then it would have to be determined whether, in light of such information, a new trial is required.

the defendant merely asserted that an in camera review of *all* of the materials in Kenny's file might have yielded something useful to him. "A subpoena is an appropriate process for the production of documents that are relevant to the matter before the court. . . . It may not be used, however, for the purpose of conducting a fishing expedition into the papers of a party or a stranger to the proceedings. . . . The subpoena should be sufficiently particularized so that the documents sought may be readily identified. The onus should not be placed on the court to inspect numerous documents for the purpose of culling out those papers which may be relevant to the matter on trial. If the subpoena on its face is too broad and sweeping, it is subject to a motion to quash." (Citations omitted.) *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 179, 474 A.2d 795 (1984); see also *State* v. *Harris*, 227 Conn. 751, 766, 631 A.2d 309 (1993) ("[a] criminal defendant does not have the right to conduct a general fishing expedition into [privileged or sensitive] records"); *State* v. *Januszewski*, 182 Conn. 142, 172, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) (same). Moreover, notwithstanding the trial court's invitation to do so, the defendant never sought to narrow the scope of the subpoena or to identify with greater particularity what information necessary to his defense likely would have been contained in Kenny's file.

Finally, the defendant made no showing that the civil lawsuit against Wal-Mart related to any disputed issue in the defendant's criminal case. As characterized by defense counsel during the hearing on the motion to quash, the civil lawsuit alleged "faulty procedures on the part of Wal-Mart with respect to the sale of firearms in general and [with respect] to the specific [firearm] alleged to have been purchased by [the defendant] . . . ."[38] It was undisputed, however, that Cavaliere had

---

[38] The record is devoid of any further information regarding the lawsuit filed against Wal-Mart.

not followed proper procedures when he had sold the Norinco rifle to the defendant; indeed, Cavaliere so testified at trial. Moreover, the defendant admitted to the police that he had purchased the rifle from Cavaliere. Under these circumstances, there simply was insufficient reason for the trial court to have undertaken an in camera inspection of the contents of Kenny's file. See *State* v. *Harris*, supra, 227 Conn. 766 (preliminary showing of relevance prerequisite to court's in camera examination of privileged records); *State* v. *Howard*, 221 Conn. 447, 457, 604 A.2d 1294 (1992) (same). We therefore reject the defendant's claim that the court improperly failed to conduct such an examination.

V

The defendant also claims that the trial court improperly instructed the jury on reasonable doubt in violation of his federal constitutional right to a fair trial. Specifically, the defendant challenges the following portions of the trial court's instruction on the meaning of reasonable doubt: (1) "[a] reasonable doubt is not a doubt . . . suggested by the ingenuity of counsel"; (2) "[a] reasonable doubt is a doubt based on reason, not on the mere possibility of innocence"; (3) "[a] reasonable doubt . . . is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence"; and (4) "[a reasonable doubt is] a doubt for which you can, in your own mind, conscientiously give a reason."[39] We reject the defendant's

---

[39] The trial court instructed the jury regarding reasonable doubt as follows: "The phrase 'reasonable doubt' has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word 'reasonable.' A reasonable doubt is a doubt for which there exists a reasonable basis arising out of the evidence or the lack of evidence. It's a doubt which is something more than a guess or surmise. It's not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or the lack of evidence.

"A reasonable doubt is a doubt based on reason, not on the mere possibility of innocence. It's a doubt for which you can, in your own mind, conscien-

claim.[40]

As the defendant acknowledges, we recently have rejected constitutional challenges to instructional language identical in all material respects to the instructional language in those portions of the trial court's charge on reasonable doubt that the defendant claims were improper. In the case of each such challenge, we concluded that the language, when considered in the context of the court's reasonable doubt charge as a whole, did not dilute the state's burden of proof. See, e.g., *State* v. *Velasco*, 253 Conn. 210, 249, 751 A.2d 800 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence" [internal quotation marks omitted]); *State* v. *Blackman*, supra, 246 Conn. 560–61 (rejecting constitutional challenge to instruction that reasonable

tiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence. It's the kind of doubt which, in the serious affairs which concern you in everyday life, you pay heed to and attention to.

"Now, of course, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty. What the law does require, however, is that, after hearing all the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of the jury, as reasonable men and women, a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Any conclusion reasonably to be drawn from the evidence which is consistent with the innocence of the accused must prevail. If there is no reasonable doubt, then the accused must be found guilty. The test is one of reasonable doubt, a doubt based upon reason and common sense."

[40] The defendant did not object to the instructional language that he challenges on appeal and, therefore, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See footnote 26 of this opinion. Although the record is adequate for our review of the defendant's claimed constitutional violation, he cannot prevail because he has not demonstrated that the challenged portions of the trial court's charge were constitutionally improper.

doubt "is a doubt based upon reason, not on the mere possibility of innocence" [internal quotation marks omitted]); *State* v. *Lewis*, 245 Conn. 779, 816–18, 717 A.2d 1140 (1998) (rejecting constitutional challenge to instruction that reasonable doubt is doubt "for which you can in your own mind conscientiously give a reason" [internal quotation marks omitted]); *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997) (rejecting constitutional challenge to instruction that reasonable doubt "is [not] a doubt suggested by the ingenuity of counsel" [internal quotation marks omitted]).[41] Because the defendant has not persuaded us why we should depart from these precedents, we decline his invitation to do so. Consequently, the defendant's claim of instructional impropriety must fail.

## VI

The defendant next claims that there was insufficient evidence to support his conviction for felony murder.[42]

---

[41] In *Taylor*, we urged our trial courts not to use the challenged language because, if "taken in isolation, [it] conceivably could misdirect the jury's attention . . . ." *State* v. *Taylor*, supra, 239 Conn. 504. Thereafter, in *State* v. *Delvalle*, 250 Conn. 466, 736 A.2d 125 (1999), which was decided after the trial of the present case, we directed our trial courts to "refrain from using the 'ingenuity of counsel' language in the future"; id., 476; "[t]o avoid any possibility of juror confusion arising from the use [there]of . . . ." Id., 475. Nevertheless, we consistently have rejected the claim that the challenged language is constitutionally defective. See id., 473–75; *State* v. *Taylor*, supra, 504–505. Furthermore, we noted in *Delvalle* that the court had informed the jury "that reasonable doubt is not a doubt suggested by the ingenuity of counsel or of a juror *not warranted by the evidence.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Delvalle*, supra, 475. As we stated in *Delvalle*, "[t]he phrase 'not warranted by the evidence' qualifies the 'ingenuity of counsel' language, and renders even more remote any possibility that the jury was misled by the latter phrase." Id. The trial court in this case used substantially similar language; see footnote 39 of this opinion; thereby reducing even further any slight risk of juror confusion from the "ingenuity of counsel" language.

[42] Count two of the information, which charged the defendant with felony murder, alleged that he had "attempted to commit a kidnapping of [the victim] and in the course of and in furtherance of such crime or of flight

Although the defendant concedes that there was sufficient evidence to establish that he had attempted to kidnap the victim,[43] he contends that there was insufficient evidence for the jury to find that the victim's death occurred "in the course of and in furtherance of" an attempted kidnapping because the victim was killed intentionally,[44] and, therefore, any attempt to kidnap the victim must have been abandoned prior to the killing. In essence, the defendant interprets the "in the course of and in furtherance of" language of § 53a-54c, our felony murder statute; see footnote 2 of this opinion; to require that the death of the victim somehow advance or promote the achievement of the underlying felony, in this case, the attempted kidnapping. The defendant misconstrues that language and, therefore, cannot prevail on his claim.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citations omit-

therefrom, [the defendant] caused the death of [the victim] . . . in violation of . . . § 53a-54c."

[43] "General Statutes § 53a-92 (a) (2) defines kidnapping as the abduction of another and the restraint of that person with the intent to inflict physical injury upon or terrorize that person. The legislature has [neither] imposed any time requirement for the restraint, nor [imposed] any distance requirement for the asportation to constitute the crime of kidnapping. . . . Because kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." (Citations omitted; internal quotation marks omitted.) *State* v. *Gomez*, 225 Conn. 347, 350–51, 622 A.2d 1014 (1993).

[44] As the defendant acknowledges, the evidence adduced at trial established beyond a reasonable doubt that the victim was killed intentionally.

ted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 435–36, 678 A.2d 1338 (1996).

The jury reasonably could have found that the defendant approached the victim's Jeep intending to kidnap her, and that he was attempting to restrain and abduct her when she resisted his efforts by sounding the horn and activating the garage door opener. The jury also reasonably could have inferred that the defendant shot and killed the victim because he was unable immediately to overcome her resistance. We conclude that these facts were sufficient to satisfy the requirement under our felony murder statute that the victim's death occur "in the course of and in furtherance of" the attempted kidnapping.[45]

"Felony murder occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime. . . . The two phrases, 'in the course of' and 'in furtherance of,' limit the applicability of the statute with respect to time and causation. *State* v. *Young*, 191 Conn. 636, 643–44, 469 A.2d 1189 (1983)." (Citation omitted.) *State* v. *Gomez*, 225 Conn. 347, 351–52, 622 A.2d 1014 (1993).

---

[45] Under § 53a-54c, a person may be found guilty of felony murder if he commits or attempts to commit, among other offenses, kidnapping, and, "in the course of and in furtherance of such crime *or of flight therefrom*, he, or another participant, if any, causes the death of a person other than one of the participants . . . ." (Emphasis added.) General Statutes § 53a-54c; see footnote 2 of this opinion. Although the evidence adduced at trial likely would have supported an alternative inference that the death of the victim had occurred during the defendant's flight from the attempted kidnapping, and although the defendant had been charged under that alternative theory; see footnote 43 of this opinion; the jury was not instructed under that theory. On appeal, therefore, the state makes no claim that the jury could have concluded that the victim's death had been caused during the defendant's flight from the attempted kidnapping. See, e.g., *Chiarella* v. *United States*, 445 U.S. 222, 236, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980) (reviewing court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury").

"The phrase 'in the course of' focuses on the temporal relationship between the murder and the underlying felony." Id., 352. We previously have defined the phrase "in the course of" for purposes of § 53a-54c to include "the period immediately before or after the actual commission of the crime . . . ." Id. The jury reasonably could have found that the attempt to kidnap the victim did not terminate until her death. In light of the close temporal proximity of the attempted kidnapping and the victim's death, the jury reasonably could have concluded that her death occurred *in the course of* the attempted kidnapping for purposes of § 53a-54c.

" '[T]he phrase 'in furtherance of' was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts. Primarily its purpose was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances which were within the contemplation of the confederates to the undertaking . . . .' *State* v. *Young*, supra, [191 Conn.] 642. When . . . the participants have kidnapped the victim at gunpoint, a jury may find that it is within the contemplation of those participants that the victim might be shot and killed." *State* v. *Gomez*, supra, 225 Conn. 352. Certainly, therefore, when, as in the present case, the defendant attempts to kidnap the victim at gunpoint, the jury reasonably may find that it was within his contemplation that the victim might be shot and killed, either accidentally or intentionally. Thus, the jury reasonably could have concluded that the murder occurred *in furtherance of* the attempted kidnapping. Consequently, the defendant's claim of evidentiary insufficiency with respect to his felony murder conviction is without merit.

## VII

Finally, the defendant claims that the trial court improperly failed to instruct the jury regarding the elements of § 53-202k and that, as a result, the jury made no express finding as to whether the state had proven that the defendant had used a firearm in the commission of a class A, B or C felony in violation of § 53-202k. See footnote 4 of this opinion. The defendant further claims that this impropriety violated his constitutional right to due process,[46] and that, consequently, the case must be remanded to the trial court with direction to vacate the five year consecutive sentence imposed by that court pursuant to § 53-202k. Although we agree with the defendant that the jury and not the trial court must make the factual determinations required under § 53-202k, we conclude that, under the circumstances of this case, the trial court's failure to instruct the jury regarding the elements of § 53-202k was harmless. We therefore reject the defendant's claim that the sentence imposed under § 53-202k must be vacated.

The following additional facts are relevant to our resolution of this claim. Prior to jury selection, the state filed a "notice of penalty enhancement pursuant to . . . § 53-202k . . . ." After the jury rendered its verdict of guilty on the murder and felony murder charges, the state, at the sentencing hearing, sought a five year sen-

---

[46] In the trial court, the defendant claimed that he was entitled to have the jury, rather than the court, decide whether he had used a firearm in the commission of the murder, but did not articulate a constitutional basis for that claim. He therefore seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See footnote 26 of this opinion. Because the record is adequate for our review of the defendant's claim, we address its merits. In addition, the defendant makes no claim that he is entitled to any greater protection under the due process clause of the state constitution; Conn. Const., art. I, § 8; than he is under the analogous federal constitutional provision. U.S. Const., amend. XIV, § 1. Accordingly, for purposes of this opinion, we treat the two provisions as affording the defendant the same level of protection.

tence enhancement pursuant to § 53-202k based on the defendant's use of a firearm during the commission of those offenses. The defendant claimed that the court could not impose any additional sentence under § 53-202k because the jury never was asked to determine whether the defendant had used a firearm in the commission of the crimes. The trial court concluded that the jury, by virtue of its determination that the defendant had committed murder, a class A felony, also necessarily had found that the state had satisfied the first requirement of § 53-202k, namely, that the defendant had committed a class A, B or C felony. The trial court also concluded that, inasmuch as the murder count expressly alleged that the defendant had caused the death of the victim "by shooting [her] with a firearm,"[47] the jury's verdict of guilty on the murder count necessarily included a finding that the state had satisfied the second requirement of § 53-202k, namely, that the defendant had used a firearm in the commission of that offense. The court then sentenced the defendant to a five year term of imprisonment pursuant to § 53-202k, to run consecutively to the sixty year prison term that the court had imposed on the defendant's murder and merged felony murder convictions.[48]

In *State* v. *Velasco*, supra, 253 Conn. 214, a case that was decided during the pendency of this appeal, we held that the jury, and not the trial court, is required to determine whether a defendant has used a firearm in the commission of a class A, B or C felony for pur-

[47] The first count of the information charged the defendant with murder as follows: "The [state] accuses the defendant . . . of the crime of murder, and alleges that on or about April 30, 1996, at about 10:52 p.m., at, in or near 863 Tolland Turnpike, Manchester, the defendant . . . with the intent to cause the death of [the victim], did cause the death of [the victim], by shooting [the victim] with a firearm, in violation of . . . § 53a-54a (a)."

[48] See footnote 6 of this opinion.

poses of § 53-202k.[49] There is no dispute that the jury was not expressly asked to make such a determination in this case. There is no question, however, that the jury's finding that the defendant had committed murder, a class A felony, necessarily satisfied the requirement of § 53-202k that the defendant commit a class A, B or C felony. Because, however, the use of a firearm is not an element of the crime of murder; see footnote 1 of this opinion; the jury lawfully could have returned a finding of guilty on the murder charge without also having found that the defendant had used a firearm in the commission of that crime. In this case, though, the information expressly alleged that the defendant intentionally had caused the victim's death "by shooting [the victim] with a firearm . . . ." Moreover, the court, in instructing the jury on the elements of murder, made express reference to the defendant's alleged use of a firearm: "The first [element of the crime of murder] is that the defendant had the intent to cause the death of another person, in this case, [the victim] . . . . The second element is that the defendant, acting with the intent to cause the death of [the victim], caused the death of that person, *in this case by shooting her with a firearm.*"[50] (Emphasis added.) Thus, a plausible case may be made that the jury's finding of guilt on the murder count necessarily included a finding that the defendant had used a firearm in the commission of that offense.

We need not decide that question, however, in light of the United States Supreme Court's recent opinion in *Neder* v. *United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), in which the court concluded that

[49] Prior to our decision in *Velasco*, we had held that § 53-202k is a sentence enhancement provision rather than a separate and distinct offense. *State* v. *Dash*, 242 Conn. 143, 146, 698 A.2d 297 (1997).

[50] We note, however, that, on several other occasions, the trial court instructed the jury on the elements of murder without reference to the use of a firearm.

a jury instruction that improperly omits an essential element from the charge constitutes harmless error if "a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence,* such that the jury verdict would have been the same absent the error . . . ." (Emphasis added.) Id., 17; accord *State* v. *Velasco,* supra, 253 Conn. 232; see also *State* v. *Faust,* 237 Conn. 454, 469, 678 A.2d 910 (1996).

In this case, the trial court failed to instruct the jury on either of the two elements of § 53-202k. As we have indicated, however, the jury necessarily found that the defendant had committed a class A felony by virtue of finding him guilty of such a felony, namely, murder. See footnote 1 of this opinion. With respect to the second element of § 53-202k, the defendant did not contest the fact, established by incontrovertible evidence, that the victim had been shot repeatedly in the head with a firearm and had died as a result of wounds caused by that firearm. Indeed, in closing argument, the defendant acknowledged that the victim had been "brutally murdered." The defendant sought to convince the jury, rather, that the evidence was insufficient to establish beyond a reasonable doubt that *he* was the shooter. Because the defendant did not dispute the fact that the victim's fatal wounds were inflicted by a firearm, and because the jury found beyond a reasonable doubt that the defendant was guilty of the victim's murder, a class A felony, the trial court's failure to instruct the jury regarding the elements of § 53-202k was harmless beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.