******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TIREA JACKSON
(AC 35294)

DiPentima, C. J., and Keller and Mihalakos, Js.

*Argued November 22, 2013—officially released May 20, 2014*

(Appeal from Superior Court, judicial district of
Fairfield, Thim, J.)

*John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Robin S. Schwartz*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Margaret E. Kelley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Tirea Jackson, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (1). Also, the defendant appeals from the judgment of conviction, rendered after a court trial, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a). The defendant claims that (1) the trial court improperly admitted into evidence a letter that had not been authenticated; (2) the court improperly admitted certain uncharged misconduct evidence, namely, testimony that he had sold illegal drugs to the victim prior to the events at issue; (3) evidence of statements made by an anonymous witness violated his confrontation clause rights; (4) the court improperly admitted evidence related to recorded prison telephone conversations of his in violation of his confrontation clause rights; and (5) the prosecutor deprived him of his right to due process by introducing evidence that he invoked his right to remain silent after he had been advised of his *Miranda* rights.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 20, 2011, at or about 4 p.m., the victim, Maria Guadalupe Upchurch, was in Bridgeport to visit with her stepfather, who lived in Marina Village. While walking to her stepfather's residence, the victim was approached by the defendant and his girlfriend, Shaneeka Durham. The victim knew the defendant and Durham well. On several occasions, beginning in the summer of 2011, the victim bought illegal drugs from the defendant, including heroin and marijuana. She considered the defendant a friend. Approximately one week earlier, the victim purchased marijuana from the defendant. The defendant and Durham accused the victim of paying for the marijuana with a counterfeit $10 bill. To assuage the defendant, the victim gave him a $10 bill that she had in her pocket. She then proceeded to walk away.

As the victim walked away, she felt something behind her. She turned to find the defendant pointing a shotgun, which was wrapped in a garbage bag, at her head. The defendant smirked at the victim and said, "I'm going to shoot you, [b]itch, you're dead . . . ." The victim put her hand up, and the defendant discharged the shotgun in close proximity to her head, causing substantial injury to the right side of her face, her right eye, and her right hand. The victim fell to the ground. The defendant stood above her, raised his shotgun, and said that if she "said anything" she was "gonna be done." While the victim lay injured on the ground, the defendant walked away from the scene. Thereafter, the victim crawled to her stepfather's residence, where she sum-

moned police and medical assistance. The victim told the police that the defendant, whom she identified as "Real," was the shooter.

After the jury returned its finding of guilt with regard to the charges of attempt to commit murder and assault in the first degree, the court addressed the criminal possession of a firearm count. Referring to the evidence presented during the trial as well as evidence related to the defendant's criminal history, the court found that the defendant, a convicted felon, possessed a firearm at the time of the commission of the crime. Accordingly, the court found the defendant guilty of criminal possession of a firearm as charged. Following a sentencing hearing, the court imposed a total effective sentence of twenty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

First, we address the defendant's claim that the court improperly admitted into evidence a letter that had not been authenticated. We disagree.

The following additional facts are relevant to this claim. During its case-in-chief, the state presented testimony from Unique Lopez. Lopez testified that, in 2011, she lived in Marina Village in Bridgeport and that she was familiar with a person she identified as "Rell." She said she knew "Rell" by way of his former girlfriend, Latoya Murray. During Lopez' testimony, she identified the defendant as the man she knew as "Rell."

Lopez testified that, approximately one week following the shooting involving the victim, she spoke with the police. Specifically, she testified that she was asked by the police about her familiarity with "Rell," and that, among other things, she indicated to the police that she knew him by way of his former girlfriend; that he "used to hang out at Marina Village;" and that he had given her his telephone number, which she shared with the police.

Thereafter, the prosecutor asked Lopez whether she had received any letters from the defendant. Lopez replied that she had received four such letters. Lopez testified that she read the first letter before discarding it, but that she had marked the other letters with the notation, "return to sender." Outside of the presence of the jury, the state marked a handwritten letter and an envelope with handwritten markings as exhibits for identification purposes.

The letter is dated October 5, 2012, and states in relevant part: "Pay for me[.] Dear Unique[.] Unique what's going on with u and Rod. Well I went to court and I started picking out jury and I think they want u show up in court but don't go ok you can't get in trouble for that. Ur name was on my paper and they trying to make you come and go on the stand. They don't have no evidence on me at all[.] The day I go to court 10-11-12 and maybe Monday is unreason ur [wrapped] in

this[.] U told the investigat[ors] I be with her baby dad. Don't be [scared] ever things going be ok it going be over real soon if see my baby mom stay low because her mom said some bulshit to investigat[ors] when they call her house in Stamford[.] Im trying come home please do this keep it real[.] Tell A-V I said whatup I hope the kid[s] doing good[.] Tell Latoya bulshitting ass when I come home I'm not fucking with u and u shited on me and we friends[.] Tell her what kill me make me stronger[.] I know she got a man that fuck up you did not write. You did not write the 10 month I was here at all. Everybody gave me there ass to kiss. Know I can shake the dirt off my shoulder LOL one love ps Hope see you soon/Booker[.]" The envelope is addressed to Lopez and the return address is from "Tirea Jackson 259678#, 1106 North Ave., BCC Bpt Ct 06604 CONN. 37A1-10 Cell." The envelope bears a postmark stamp from Stamford on October 4, 2012.

By way of an offer of proof, which occurred on the first day of trial, October 10, 2012, Lopez testified that she had received these items at her home within the preceding few days. She informed an inspector in the prosecutor's office that she had received a letter from the defendant, and provided the letter and the envelope to the prosecutor. She testified that the letter arrived in a sealed envelope and that she believed the letter was from "Rell." Lopez testified that she did not know a person by the name of "Booker," and that she did not know if *any* of the letters at issue, despite bearing the defendant's return address, truly were from the defendant because she "[was] just going by what the envelope says."

The defendant's attorney argued that the evidence did not demonstrate that either the letter or the envelope originated from the defendant. The defendant's attorney noted that the letter was not signed by the defendant and that Lopez was unable to do more than speculate as to its origin. The defendant's attorney argued, as well, that the letter was "highly prejudicial" to the defense. The prosecutor asserted that the envelope bore the defendant's name and return address; the letter was mailed to Lopez' home; the letter was dated October 5, 2012, and referred to the status of the present trial, specifically, jury selection; and the letter referred to Lopez' anticipated appearance at trial. On the basis of the foregoing, the prosecutor argued that the issue of whether the defendant had authored the letter was a question of fact for the jury.

After hearing the offer of proof, the court agreed with the state. The court stated: "We have the return address on the envelope, we have the address on the envelope . . . addressed to the witness [who] received it sealed, and opened it and brought it in to [the prosecutor's office] and said this is a letter I received. The letter refers to the jury selection process. You know, I think

there's sufficient indicia of authorship, so the objection is overruled. It's up to the jury to decide in the end."

During her subsequent testimony before the jury, Lopez stated that she recognized the letter and the envelope as having been from the defendant, that she had received them three or four days earlier and that, after contacting the prosecutor's office, she brought them with her to court that day. Lopez was asked how she knew that the letter was from the defendant. She testified that it was mailed to her home, in a sealed envelope, and that the envelope bore the defendant's name and return address. The letter was published to the jury. The state relied on the letter as evidence that the defendant had contacted Lopez and had asked her not to testify.[2]

The defendant does not claim that the letter was not relevant to an issue before the jury. Rather, the defendant claims that the letter was not authenticated because there was insufficient evidence to support a finding that it was "authored by or at least coming from or otherwise connected to [the defendant]." The defendant argues that although the court relied on the fact that the envelope bore his return address at prison and that the letter referred to facts concerning the trial, his address and the facts about jury selection were public information, not information that could have come only from him. The defendant argues that there is no support for the proposition that letters mailed in sealed envelopes that bear return addresses are self-authenticating. Furthermore, the defendant asserts that an examination of the letter readily gives rise to questions as to its authenticity. For example, the defendant argues that the word "Booker" appears at the conclusion of the letter, only the envelope bears the defendant's real name, the handwriting on the envelope "is manifestly different from that on the letter," the date on the letter is one day after the postmark date on the envelope, and, although the letter bears a Bridgeport return address, it appears to have been postmarked in Stamford. The defendant asserts that the admission of the letter constituted reversible error.

"To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76

(2010). Here, there is no argument or indication that the court misinterpreted the law. Accordingly, we examine whether the court properly applied the relevant evidentiary principles to the evidence at issue.

"The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). "It is well established that [a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence. . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Internal quotation marks omitted.) *State* v. *Garcia*, 299 Conn. 39, 57–58, 7 A.3d 355 (2010); see also *State* v. *Rosado*, 52 Conn. App. 408, 426–27, 726 A.2d 1177 (1999) (authentication requirement satisfied when there is sufficient information to establish that letter had been written pursuant to defendant's consent or authorization).

We agree with the state that there was a prima facie showing that the letter was what the state claimed it to be, namely, a letter sent from the defendant to Lopez. The state made a showing that the letter arrived in a sealed envelope that was addressed to Lopez and bore the defendant's name, inmate number and return address in prison. The envelope was postmarked on a date in which the defendant was incarcerated. Lopez, who knew the defendant and had received other letters from him prior to receiving the letter at issue, was familiar with the contents of the letter and testified as to her belief that the defendant sent the letter to her. This is significant because the contents of the letter were not limited to an impersonal request that Lopez not testify, but dealt with other intimate matters that the finder of fact readily could infer would not widely be known outside of the relationship of the defendant and Lopez. Additionally, the contents of the letter revealed information about the prosecution of the state's case that would have been known by the defendant and, as the state correctly asserts, would likely have been known only by persons with intimate knowledge of trial matters, such as the defendant.[3] Specifically, the letter referred to jury selection as well as Lopez being a potential witness for the state.

In *State* v. *John L.*, 85 Conn. App. 291, 298–302, 856

A.2d 1032, cert. denied, 272 Conn. 903, 863 A.2d 695 (2004), this court rejected a claim that a trial court improperly had admitted into evidence two letters that were retrieved from a defendant's computer. It was not in dispute that the letters were not handwritten, the letters were not signed by the defendant, and that others with access to the defendant's computer could have written the letters or altered the date on the letters. Id., 300. This court, relying on the proposition that in authenticating the letters the state could rely on circumstantial evidence, including the content of the letters and the circumstances surrounding their discovery, all of which supported a finding that they were authored by the defendant, upheld their admission into evidence. Id., 302. As in *John L.*, there was ample circumstantial evidence to support a finding that the letter at issue in the present case, though not signed by the defendant, was sent by him to Lopez.

As discussed previously, the defendant points to facts that weigh against a finding that the letter originated from him or that it was sent on his behalf. These arguments mirror the tenor and substance of the defendant's cross-examination of Lopez concerning the letter as well as the closing arguments made by the defense during trial. The defendant's arguments against a finding that the letter constituted consciousness of guilt evidence were fodder for the jury's consideration, but they merely related to the weight of the evidence rather than its admissibility. The state, in proffering the letter, was not obliged to demonstrate beyond any doubt that the letter originated from the defendant. "The proponent need only advance evidence sufficient to support a finding that the proffered evidence is what it is claimed to be. Once this prima facie showing is made, the evidence may be admitted and the ultimate determination of authenticity rests with the fact finder. . . . [C]ompliance with Section 9-1 (a) does not automatically guarantee that the fact finder will accept the proffered evidence as genuine. The opposing party may still offer evidence to discredit the proponent's prima facie showing." (Internal quotation marks omitted.) Conn. Code Evid. § 9-1 (a), commentary.

The gist of the defendant's claim is that the state failed to produce compelling evidence that the defendant authored the letter or that it was sent on his behalf. Presumably, this evidence would relate to the circumstances surrounding the writing of the letter. By couching his claim against authentication in such terms, the defendant urges us to place a nearly insurmountable barrier to the admission of such documents, for it would require the presentation of evidence that, one readily may presume, typically would be known only to the author of the writing. Our law, instead, permits such writings to be authenticated by means of direct and circumstantial evidence. Here, the written words on the envelope and the letter, as well as the circumstances

surrounding them, supported a finding that the letter was what the state claimed it to be. Accordingly, we conclude that the court's ruling reflected a sound exercise of its discretion.

## II

Next, the defendant argues that the court improperly admitted certain uncharged evidence, namely, testimony that he had sold illegal drugs to the victim prior to the events at issue. We disagree.

The record reveals the following relevant facts. After the court granted the defendant's motion for notice of uncharged misconduct evidence, the state provided notice to the defendant and the court that, among other evidence, it intended to introduce evidence that the defendant sold marijuana to the victim. The defendant's attorney stated: "Your Honor, we simply state for the record . . . I think it's prejudicial to the defendant." The court stated that it had reviewed the arrest warrant and that the evidence was relevant to the issue of the victim's ability to identify the defendant as the perpetrator of the offense. The court stated: "I believe it will explain how it is that the witness knows the defendant, so I believe it's admissible. We may have an objection later on but—okay. . . . [L]et's proceed." Thereafter, neither party addressed the court further regarding this evidence.

During the state's case-in-chief, the state elicited evidence that the defendant had sold illegal drugs to the victim. The prosecutor asked the victim "what type of interaction [she had] with the defendant in the summer of 2011?" The victim testified that on several occasions beginning in the summer of 2011, she "had bought drugs" from the defendant and that they became "like associates, friends . . . ." The prosecutor asked the victim what kind of drugs she had purchased, to which the victim replied that she had bought marijuana and heroin from the defendant. The victim testified that, in the beginning of this relationship, she typically bought illegal drugs from the defendant, in Marina Village, two or three times each week, but "then it broke down to probably once or twice a week." The victim testified that she purchased $10 in marijuana from the defendant approximately one week prior to the events at issue and, as stated previously in this opinion, the incident was precipitated by a dispute over the form of payment.

Evidence of the defendant's drug selling was presented during the examination of other witnesses, as well. Durham testified that she and the defendant knew the victim, in part, because the victim purchased "weed and crack" from the defendant. Officer Luis Pomales, a first responder to the crime scene on November 20, 2011, testified that the victim stated to him that, prior to the shooting, the defendant accused her of giving him a counterfeit $10 bill during a marijuana purchase

that occurred one week earlier. Pomales said that, according to the victim, the defendant demanded payment.

The defense attempted to cast doubt on the victim's identification of the defendant as the perpetrator of the crime. During closing argument, the prosecutor referred to the fact that the state bore the burden of demonstrating that the defendant was the perpetrator. In argument, the prosecutor discussed the evidence of the defendant's drug selling conduct and, consistent with that evidence, referred to the defendant as a drug seller.[4]

On appeal, the defendant argues that evidence that he sold drugs should have been excluded because it "severely prejudiced" the defense, the court did not deliver an instruction limiting the jury's consideration of this uncharged misconduct evidence, the state elicited and used this evidence only to attack his character, the state adequately could have demonstrated the basis of the victim's ability to identify him as the perpetrator of the crime without referring to his drug dealing, and "the court should have understood the state's specious ploy and excluded the *specific* evidence that [he] met with [the victim] to *deal drugs*." (Emphasis in original.) Furthermore, the defendant argues that the state's disclosure of the uncharged misconduct evidence was untimely and should have been excluded on that ground.

Although the defendant states in his brief that the court admitted the evidence "over defense objection," the brief does not specify the nature of that objection. The defense did not file a pretrial motion in limine to preclude the evidence. Beyond the statement of the defendant's attorney, prior to the presentation of evidence, that the evidence of the defendant's sale of marijuana to the victim was "prejudicial," an issue concerning which the court contemplated hearing a further objection during the course of the trial, the defense did not voice any objection to the state's inquiries into the defendant's drug selling conduct, the testimonial evidence concerning such conduct, or the state's arguments concerning such conduct. There was no objection that was based on the timeliness of the state's disclosure of uncharged misconduct evidence. There was no objection on this ground to the content of the state's closing argument.[5] There was no objection to the court's failure to deliver a limiting instruction with regard to the evidence at issue or its failure to curtail the state's inquiries or argument. Consequently, the only ruling occasioned by the defense with regard to this evidence occurred prior to the presentation of evidence, when the court found that the victim's anticipated testimony as to her purchases of illegal drugs from the defendant was relevant to evaluating her identification of the defendant.

In most circumstances, "[w]e do not review claims

raised for the first time on appeal." *State* v. *Williams*, 146 Conn. App. 114, 144, 75 A.3d 668, cert. granted on other grounds, 310 Conn. 959, 82 A.3d 626 (2013). Here, the defendant does not invoke any type of extraordinary review for the aspects of his claim that were not preserved at trial. "When a party raises a claim for the first time on appeal, our review of the claim is limited to review under either the plain error doctrine as provided by Practice Book § 60-5, or the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). . . . This court often has noted that it is not appropriate to engage in a level of review that is not requested. . . . When the parties have neither briefed nor argued plain error [or *Golding* review], we will not afford such review." (Internal quotation marks omitted.) *State* v. *Patterson*, 143 Conn. App. 804, 808, 70 A.3d 198, cert. denied, 310 Conn. 913, 76 A.3d 630 (2013).

At trial, the defendant's attorney asserted merely that evidence that the defendant sold marijuana to the victim was "prejudicial." As a preliminary matter, this general comment is unavailing on its face because "all adverse evidence is prejudicial to the defense." *State* v. *VanAllen*, 140 Conn. App. 689, 697, 59 A.3d 888, cert. denied, 308 Conn. 921, 62 A.3d 1134 (2013). To the extent that the statement fairly may be said to have apprised the court of an objection on the ground of *unfair* prejudice; see Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of *unfair* prejudice" [emphasis added]); we are not persuaded that the court improperly concluded that the evidence was not unfairly prejudicial to the defense.

"In evaluating whether the court properly ruled that the uncharged misconduct evidence was admissible, we look to the evidence presented to the court at the time it made that ruling. See *State* v. *Harris*, 32 Conn. App. 476, 481 n.4, 629 A.2d 1166 ('[w]e are bound to evaluate the propriety of the trial court's rulings on the basis of the facts known to the court at the time of its rulings'), cert. denied, 227 Conn. 928, 632 A.2d 706 (1993)." (Footnote omitted.) *State* v. *Allen*, 140 Conn. App. 423, 434, 59 A.3d 351, cert. denied, 308 Conn. 934, 66 A.3d 497 (2013).

At the time it made its ruling, the court had reviewed the arrest warrant. As reflected in the court file, the application for an arrest warrant included an affidavit in which a police officer averred that the police had information from the victim that the shooting was incident to a dispute concerning the allegedly counterfeit $10 bill that the victim gave to the defendant incident to her purchase of marijuana from him. As stated previously, the prosecutor, in disclosing the uncharged misconduct evidence, indicated simply that the state intended to present evidence that the defendant sold marijuana to the victim. The court concluded that the evidence was admissible because it was relevant to

the issue of identity, but the court suggested that the defendant could raise further objections related to the evidence during the trial.

We already have set forth the standard of review for evidentiary claims in part I of this opinion. Turning to the law concerning uncharged misconduct, we observe that "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Conn. Code Evid. § 4-5 (a). "Evidence of other crimes, wrongs or acts of a person is admissible for purposes . . . such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (b).

The court reasonably determined that evidence that the defendant sold marijuana to the victim was highly probative of the disputed factual issue of identity. This evidence was not tangential to the state's theory of the case, but integral to the crime; the evidence strongly supported a finding that the victim accurately identified the defendant as the perpetrator. Certainly, because the evidence demonstrated that the defendant was engaged in illegal conduct, it tended to cast him in a negative light. Yet, given the high degree of probative value of the evidence, we are persuaded that the court, at the early stage of the proceeding at which it was asked to consider the admissibility of the evidence, did not abuse its discretion by permitting the state to introduce it. Although the defendant, before this court, raises a number of nuanced arguments against the admission of the evidence, he failed to accept the court's invitation to revisit the issue at trial and, thus, did not raise any of those concerns there.

### III

Next, the defendant claims for the first time on appeal that evidence of statements made by an anonymous witness violated his confrontation clause rights. We conclude that the defendant's claim is unavailing.

During her testimony, the victim testified that the gun used by the defendant during the events at issue was in a plastic bag with tape wrapped around it. The victim testified that she thought the bag containing the gun was green, but that she was not sure because she was focused on the defendant at the time. The victim testified that the defendant was standing a few feet away from her when he discharged his shotgun in close proximity to her head, but she recalled looking at the handle of the gun and the plastic wrapped around it. The victim testified that she was not familiar with guns, but she said the defendant used a large shotgun, one that she testified was consistent with the shotgun ultimately admitted into evidence, which was, at the time of her

testimony, marked for identification purposes as a state's exhibit.

The state presented testimony from Pomales, who, as a first responder to the crime scene, spoke with the victim and immediately began an investigation to apprehend the shooter. Pomales testified that the victim told him at the crime scene that the shooter brandished a shotgun inside of a black garbage bag. Pomales recalled that he was receiving information from the victim at the time that she was receiving medical treatment in an ambulance at the crime scene. Pomales said that he related the information that he learned from the victim, including a description of the suspect, to other police officers, including Sergeant Ronald Mercado. He related information as necessary by using his radio handset.

Pomales testified that he remained at the crime scene after the victim had been transported to the hospital. Pomales stated that, after he went to an apartment that the victim identified as being the place from which the shooter emerged with the shotgun, Mercado informed him that he had been in contact with an anonymous tipster who "gav[e] him a description of a party that the firearm was handed to" as well as an address of an apartment in Marina Village where the shotgun was located. Pomales said that on the basis of his training and experience, "speedy information" of this nature is relied on by the police. Upon arriving at the apartment, the police were given consent to search. Incident to their search, the police discovered and seized a shotgun and a red towel that were concealed in a black garbage bag in a closet. The police also discovered and seized two live rounds, found in the garbage bag, as well as a spent shell casing, found inside the shotgun itself. Absent objection, the court admitted all of these items into evidence.

Mercado testified that on the day of the shooting, he traveled to the crime scene in Marina Village after hearing a radio transmission concerning the shooting. He said that "[a]t that point, I headed to that area along with my men to canvass for a suspect of the shooting." He said that when he arrived, emergency responders still were tending to the victim and that he was "solely focusing on trying to find a suspect who just committed a shooting armed with a firearm." He said he learned a description of the victim and that, while patrolling and looking for the shooter, he got an update from an anonymous witness who told one of his officers "that the suspect . . . [h]anded off the shotgun to a female, who then, in turn, handed the shotgun off to a young Hispanic male named Carlos." Mercado related this information to other police officers and indicated that, "at this point, we're now looking for a young Hispanic male who's possibly armed with a shotgun." He said that one of his officers discovered the person for whom

they were searching, a Hispanic male named Juan Carlos Cardona, and then went to his residence, which was close to the crime scene. At the residence, Mercado spoke to Cardona's mother, who gave consent to search the residence. Later, the shotgun and plastic bag, marked as exhibits at trial, were discovered in a closet of the residence.

Cardona testified that he lived in Marina Village on the date of the shooting, November 20, 2011. After he heard gunshots, he walked outside of his residence to investigate, at which time he encountered a black female that he recognized from his neighborhood. At her request, Cardona took possession of the black garbage bag and the shotgun, which were consistent with the items marked as state's exhibits at trial, and concealed them in a closet at his residence. He testified that although he did not examine the items, he recognized from the weight and shape of the items that he had been given a shotgun.

On appeal, the defendant emphasizes that the testimony of Pomales and Mercado was essential to demonstrate the chain of custody of the shotgun, which was admitted into evidence. Also, the defendant emphasizes that the evidence concerning the shotgun, including evidence related to its condition and the types of cartridges used, played a prominent role in the state's theory of the case. The defendant asserts that the testimony of Pomales and Mercado concerning the anonymous witness who provided information to the police was inadmissible hearsay. The defendant correctly acknowledges that before the trial court he did not object to this testimony. The defendant, claiming that the admission of the alleged hearsay statements of the anonymous witness, who did not testify at trial, violated his sixth amendment right to confrontation, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, and, in the alternative, asserts that the admission of the testimony constituted plain error. See Practice Book § 60-5.

The state asserts that the invocation of *Golding* is unavailing because (1) the defendant's claim is evidentiary in nature; (2) if the claim is constitutional in nature, the record is inadequate to review the issue of whether, under *Crawford* v. *Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the declarant's statements were testimonial in nature; and (3) if the record is adequate to review the claim under *Crawford*, the defendant's rights were not violated because the statements were not testimonial in nature. Finally, the state asserts that any error in admitting the testimony was harmless beyond a reasonable doubt. Because the record reflects that any error in admitting the testimony was harmless beyond a reasonable doubt, we conclude that the defendant is unable to prevail under *Golding*.

Pursuant to *Golding*, "a defendant can prevail on a

claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

"The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings. . . . It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . and only if the error was not harmless may the defendant prevail on his *Golding* claim. . . . The state bears the burden of proving that the error is harmless beyond a reasonable doubt. . . . [T]he test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Citations omitted; internal quotation marks omitted.) *State* v. *Stovall*, 142 Conn. App. 562, 581, 64 A.3d 819, cert. granted on other grounds, 309 Conn. 917, 70 A.3d 40 (2013).

The defendant accurately states that the primary import of the testimony at issue, concerning the statements of the anonymous witness who provided information to the police, was that it helped the state lay a foundation for the admission of the shotgun and the shotgun shells discovered by the police in Cardona's residence. As a preliminary matter, however, this testimony was not critical to the admission of the shotgun evidence.[6] There was testimony about the shooting and the police discovery of the shotgun in Cardona's residence, which was near the crime scene. As described previously, the victim testified that the shotgun presented at trial was consistent with the shotgun that the defendant pointed at her and discharged in the direction of her face. Likewise, Cardona testified that the shotgun and the bag in which it was concealed, presented as trial exhibits, were consistent with the shotgun and bag handed to him by a female at or about the time of the shooting. This testimony made it reasonable for the finder of fact to find that the gun was used by the shooter and justified the admission of the evidence.

Moreover, the shotgun evidence was not critical to the state's case. The defendant was convicted of attempt to commit murder, assault in the first degree, and criminal possession of a firearm. To obtain a conviction, the state was not required to present the shotgun used by the defendant in the commission of any of the offenses or any physical evidence definitely proving that he possessed or used a shotgun at the time of the crimes. With regard to attempt to commit murder, as charged, it was sufficient for the state to present evidence that the defendant, intending to cause the victim's death, intentionally engaged in conduct that constituted a substantial step in a course of conduct planned to culminate in the victim's death. With regard to assault, as charged, it was sufficient for the state to present evidence that the defendant intended to cause serious physical injury to the victim and that he caused such injury by means of a shotgun. With regard to criminal possession of a firearm, as charged, it was sufficient for the state to present evidence that the defendant possessed a firearm and that he previously had been convicted of the crime of sale of narcotics.

The victim's testimony was compelling evidence to support a finding beyond a reasonable doubt that the defendant possessed a shotgun on the date of the shooting and used it in such a manner that he committed the offenses of attempt to commit murder and assault in the first degree. The evidence strongly reflected that the victim was familiar with the defendant prior to the shooting and that she had an opportunity to observe that he was the perpetrator. The defendant asserts that "[this court] can have no confidence that the jury would have found intent to kill or intent to seriously injure without [the admission of the shotgun]." Yet, the victim's own testimony concerning the defendant's conduct—her description of the shotgun and the manner in which the defendant used it to inflict serious physical injury to her—is highly probative of his criminal mental state. The evidence concerning her injuries strongly supported a finding that he used a shotgun precisely in the violent manner described in her testimony.

Apart from the victim's testimony concerning the identification of the defendant as the perpetrator, Durham testified that the defendant, who was her "off and on" boyfriend as well as the father of her child, sold drugs to the victim and that he was at Marina Village on November 20, 2011. Durham testified that the victim and the defendant got into an argument that day, but that she walked away from the scene.

Having reviewed the evidence presented in its entirety, we are not persuaded that the evidence at issue in the present claim had any effect on the outcome of the trial. The statements of the anonymous witness who provided information to the police were not essential to the admission of the shotgun evidence, and the

shotgun evidence was not essential to the state's case. Under these circumstances, any impropriety in the admission of the evidence was harmless beyond a reasonable doubt. Accordingly, the claim fails under *Golding*'s fourth prong.[7]

## IV

Next, the defendant claims that the court improperly admitted evidence related to his recorded prison telephone conversations in violation of his confrontation clause rights. We decline to review this unpreserved claim.

The following additional facts are relevant to our analysis of this claim. At trial, on the first day that evidence was presented, the prosecutor stated that the state intended to present uncharged misconduct evidence in the form of tape-recorded telephone conversations involving the defendant. The prosecutor stated that these conversations were initiated by the defendant in the "last couple of weeks" prior to trial, while he was incarcerated awaiting trial. Further, the prosecutor stated that the conversations "concern[ed] inducements for the complaining witness not to testify." The defendant's attorney indicated that although he was in possession of notes related to these recorded telephone conversations, he wanted an opportunity to listen to the recordings themselves. The court, noting that the evidence appeared to be admissible, agreed to this request.

The next day, the prosecutor indicated that, in the presence of the jury during his examination of a witness, he intended to play a recording of one telephone conversation that was recorded on September 12, 2012. The defendant's attorney objected on the specific grounds of relevancy and hearsay. The defendant's attorney stated to the court that it was, in fact, the defendant's voice on the tape. He argued, however, that the defendant's statements during the conversation did not tend to reflect his consciousness of guilt and that the statements of a third party during the conversation constituted hearsay. Outside of the presence of the jury, the court heard the recording. The prosecutor stated that the recording reflected a conversation initiated by the defendant from prison to his home and that, in the conversation, a third party attempted to calm the defendant by telling him "that he found the girl and he'd break her off $500 if she don't go . . . ." The prosecutor stated that the telephone call was made less than one month prior to the trial and that descriptive references to "the girl" in the conversation strongly supported a finding that the conversation concerned the victim. The prosecutor stated that this was strong evidence of the defendant's consciousness of guilt.

The court agreed with the state and overruled the defendant's objection. The court stated that it would

deliver a limiting instruction to the effect that the jury was to consider the defendant's statements solely as evidence of consciousness of guilt. The court delivered such an instruction at the time that it permitted the state to play the recorded conversation, and it reiterated the instruction in its charge.[8] The prosecutor played the recording during the testimony of David Lavery, a telephone monitor employed by the Department of Correction's security division.

On appeal, the defendant neither reiterates the evidentiary objection raised at trial, one based on relevancy and hearsay, nor challenges the adequacy of the court's limiting instructions. Instead, the defendant claims that the court improperly admitted the taped conversation because the state did not provide an adequate foundation for the admission of the evidence. The defendant argues that although the state attempted to authenticate the recorded conversation by means of Lavery's testimony, Lavery did not actually record the telephone conversation, but merely reviewed taped conversations, purportedly of the defendant, that he had requested from the defendant's prison. The defendant goes on to assert that "the State should have produced the prison employee that actually taped [his telephone] calls and gathered the tapes [of such recorded conversations]." Thus, vaguely couching his claim as one arising under the confrontation clause, the defendant argues that "[he] was deprived of the right to confront the true witness against him."

In summary fashion, the defendant asserts that he is entitled to *Golding* review of this unpreserved claim. The defendant's *Golding* claim is unavailing because his claim is not constitutional in nature. In essence, the defendant argues that the state failed to present a witness through which the taped conversation could be authenticated properly. Before the trial court, the defendant's attorney stated to the trial court that the evidence at issue was, in fact, a recording of the defendant. The defendant did not object to the evidence on the ground of authentication, and he is precluded from raising such an unpreserved evidentiary claim for the first time on appeal. His claim that he was deprived of the right to confront a hypothetically competent witness who should have been called to testify by the state is a veiled attempt to raise a claim related to authentication in the guise of a confrontation clause claim.[9] Accordingly, we decline to review the claim under *Golding*.

V

Finally, the defendant claims that the prosecutor deprived him of his right to due process by introducing evidence that he invoked his right to remain silent after he had been advised of his *Miranda* rights. We disagree.

The following additional facts are relevant to this

claim. During the state's case-in-chief, the state presented testimony from Sean Ronan, a detective with the Bridgeport Police Department. Ronan was one of the police officers who responded to the Marina Village crime scene on November 20, 2011. Ronan testified that, as part of his investigation, he interviewed the defendant following his arrest. Responding to questions about the course of the police investigation into the shooting, Ronan testified that, prior to the interview at police headquarters, he provided the defendant with a written waiver of *Miranda* rights form. Ronan testified that he read the provisions set forth on the form, and that the defendant wrote his initials next to each provision and signed the form. The form was introduced into evidence. One of the provisions on the form, read aloud in court by Ronan, stated: "Now that I have been advised of my rights and that I fully understand these rights, I am willing to be interviewed and answer questions. I do not wish the presence of an attorney at this time. I am waiving these rights [freely] and voluntarily without any fear, threat or promises being made to me."

The following colloquy between the prosecutor and Ronan occurred:

"Q. Now, after advising [the defendant] of his rights and having him sign that, did you talk to him at all as a result of him having waived those rights?

"A. I asked him if he would talk to me about the incident that happened in Marina Village.

"Q. And what was [the defendant's] response when you said that to him?

"A. He said, I don't know what you're talking about, I've never been to Marina. I don't hang around there.

"Q. And did he mention anything about any type of firearm or gun?

"A. He said he never owned or shot a gun.

"Q. And other than that information, did [the defendant] provide you with any additional information?

"A. No, the next question I asked he refused to answer and said, you know, we'll go back upstairs.

"Q. And did the interview terminate at that time?

"A. Yes, ma'am.

"Q. And have you had any further contact with the defendant after that point?

"A. None. No, ma'am."

During closing argument, the prosecutor referred to the statements that the defendant made to Ronan following his arrest. The prosecutor argued in relevant part: "You're also going to hear an instruction about statements, the defendant's statements that can be considered by you, and I direct your attention to Detective

Sean Ronan, who testified yesterday, who, at the time Detective Ronan met with the defendant after the arrest, that the defendant [made] statements, I don't know what you're talking about, I've never even been in Marina Village and I've never owned or fired a gun. And His Honor is going to talk to you about a concept known as consciousness of guilt, and consciousness of guilt, you may, if you chose to believe, consider statements that were made of actions by the defendant if you decide that they reflect a consciousness of guilt." Immediately thereafter, the prosecutor drew the jury's attention to evidence relevant to consciousness of guilt, specifically, the letter received by Lopez that we discussed in part I of this opinion, and the recorded telephone conversation that we discussed in part IV of this opinion.

At trial, the defendant's attorney did not object to the prosecutor's inquiries of Ronan or the prosecutor's reference, made during closing argument, to the evidence of the statements made by the defendant to Ronan during the post-*Miranda* interrogation. On appeal, the defendant argues that, in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the prosecutor purposely elicited testimony from Ronan during the state's case-in-chief about his invocation of his right to remain silent and, during closing argument, "cleverly ask[ed] the jury to consider that only a guilty person would act to invoke his *Miranda* rights and refuse to answer the police's questions." The statements on which the defendant relies are set forth previously. The defendant seeks *Golding* review of this unpreserved claim that, he asserts, deprived him of his due process right to a fair trial and, accordingly, warrants the reversal of his conviction. The claim is reviewable under *Golding* because the record discloses the factual circumstances relevant to the defendant's claim and the claimed violation is of constitutional magnitude. See, e.g., *State* v. *Boyd*, 295 Conn. 707, 751, 992 A.2d 1071 (2010), cert. denied,      U.S.     , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011); *State* v. *Camacho*, 92 Conn. App. 271, 279, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006).

Our Supreme Court has stated: "In *Doyle* [v. *Ohio*, supra, 426 U.S. 610] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to

impeach an explanation subsequently offered at trial. . . . The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. . . .

"This court has recognized that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt . . . and has noted that post-*Miranda* silence under *Doyle* does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted. . . .

"This court has also recognized that [r]eferences to one's invocation of the right to remain silent [are] not always constitutionally impermissible . . . [and are] allowed . . . in certain limited and exceptional circumstances. . . . Specifically, the state is permitted some leeway in adducing evidence of the defendant's assertion of that right for purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . as long as the evidence is not offered to impeach the testimony of the defendant in any way." (Citations omitted; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 580–82, 4 A.3d 1176 (2010).

As set forth previously, the state presented Ronan's testimony in its case-in-chief that, during his interview of the defendant, while the defendant was in police custody and after he had been advised of and had waived his *Miranda* rights, the defendant answered some questions about the crime but refused to answer other questions, thereby terminating the interview. The record does not reflect that the prosecutor elicited evidence about how the defendant exercised his right to terminate the interview or what question or questions the defendant had declined to answer.

In arguing that a *Doyle* violation occurred, the defendant relies on *State* v. *Montgomery*, 254 Conn. 694, 710–16, 759 A.2d 995 (2000). In *Montgomery*, the state presented evidence during its case-in-chief that the defendant, prior to his arrest and while he was not in police custody, spoke with the police after being advised of his *Miranda* rights. Id., 710–12. The state presented evidence that the defendant answered several questions about his involvement in a killing, but at one point during the interview when he was asked whether the victim's death had been premeditated or

a crime of passion, "[he] did not respond verbally to [the detective's] question, but tears welled up in his eyes, he began to shake and signaled for a nurse to terminate the interview. The police then asked the defendant no further questions." Id., 712. Our Supreme Court concluded that the introduction of this evidence ran afoul of *Doyle*. Id., 715–16. The court held that "the evidence adduced by the state regarding the defendant's refusal to answer any further questions was fundamentally unfair and thus in violation of his rights under the fifth and fourteenth amendments to the United States constitution."[10] Id.

The state attempts to distinguish *Montgomery* on the ground that, unlike the situation in *Montgomery*, the record in the present case does not reflect that the state presented evidence of how the defendant invoked his right to remain silent or what question or questions the defendant declined to answer. The state argues that the present case is analogous to *State* v. *Moye*, 177 Conn. 487, 495–99, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on appeal after remand, 179 Conn. 761, 409 A.2d 149 (1979), in which our Supreme Court held that the introduction of evidence by the state that a defendant, on the advice of counsel, had terminated giving a postarrest statement to the police did not violate *Doyle*. In reaching this conclusion, our Supreme Court reasoned that, in *Moye*, the state presented this evidence of postarrest silence not for a constitutionally repugnant purpose—such as to impeach the defendant's credibility or to demonstrate his criminal liability—but to counter the defendant's unambiguous reliance on the unfinished exculpatory statement he gave to the police, and "to show the investigative effort made by the police and the sequence of events as they unfolded . . . ." Id., 499.

In the present case, unlike *Montgomery*, the prosecutor did not elicit evidence concerning the manner in which the defendant terminated the interview or what question or questions the defendant declined to answer. This is significant because the detailed information concerning the defendant's exercise of his right to remain silent in *Montgomery* tended to suggest that the line of inquiry related to the crime caused the defendant emotional pain because of his criminal culpability. Thus, there was a risk in *Montgomery* that the manner in which the defendant exercised his right to remain silent provided a means by which the state could have demonstrated his guilt because, essentially, it was evidence of silence in the face of accusation.

Here, the evidence related to the cessation of the interview lacked such details, but appeared, instead, to be part of the narrative of how the police investigation proceeded, which is permissible under *Moye*. In the present case, however, unlike the circumstances present in *Moye*, there was no logical reason why the state

should have presented the evidence related to the defendant's invocation of his right to remain silent. Stated otherwise, this case does not present the " 'limited and exceptional circumstances' " in which courts have permitted references to a defendant's silence. *State* v. *Lockhart*, supra, 298 Conn. 581. Although it may be said that the state presented evidence that the defendant terminated the interview and chose to remain silent, it does not appear that this evidence was elicited. The prosecutor did not ask Ronan to discuss the cessation of the interview, but Ronan divulged the defendant's invocation of his right in response to the prosecutor's seemingly innocuous question about what information the defendant had provided to the police during his interview.[11] Moreover, contrary to the defendant's characterization of what occurred at trial, there is no indication that the state *referred* to the evidence that he terminated the interview, either in questioning or argument. Thus, while we acknowledge that the state presented evidence that rarely is permissible, we do not conclude that the state ran afoul of *Doyle* because there is no indication in the record that the state either presented or utilized the evidence at issue, concerning the defendant's termination of the interview, for a forbidden purpose.

Even were we to conclude that the evidence presented by the state related to the defendant's exercise of his right to remain silent was fundamentally unfair to the defendant, we readily conclude that any violation of *Doyle* was harmless beyond a reasonable doubt. "*Doyle* violations are . . . subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . .

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a Miranda warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's

comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) *State* v. *Bereis*, 117 Conn. App. 360, 377–78, 978 A.2d 1122 (2009); see also *State* v. *Brunetti*, 279 Conn. 39, 84–85, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). "[W]hen there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story." (Citations omitted; internal quotation marks omitted.) *State* v. *Silano*, 204 Conn. 769, 781, 529 A.2d 1283 (1987).

In the present case, the prosecutor did not focus on or highlight the defendant's silence in any manner. Although Ronan testified that the defendant refused to answer and terminated the interview, the prosecutor merely asked if the interview had terminated at that time. The defendant suggests that the prosecutor, during closing argument, attempted to link the defendant's silence with consciousness of guilt and, thus, referred to the evidence for a forbidden purpose. We have reviewed the relevant portion of the argument, set forth previously, and it is unreasonable to afford the argument such a sinister interpretation. Without any reference to the fact that the defendant had terminated the interview, the prosecutor merely referred to the statements that the defendant provided to Ronan. Certainly, the prosecutor's reference to this evidence was not improper. The prosecutor then invited the jury to consider evidence of the defendant's consciousness of guilt and in so doing referred explicitly to evidence that was admitted for that purpose.

In the present case, there were no references by the state to the evidence at issue, concerning the defendant's termination of the police interview. When the court instructed the jury concerning consciousness of guilt evidence, it did not refer to the evidence that the defendant had terminated a police interview. The evidence came in the form of an isolated response to an innocuous question asked by the prosecutor related to the police interview. The argument was not used for an improper impeachment purpose because the defendant did not testify. Nor was the evidence linked to any exculpatory story advanced by the defense. There was

no emphasis on this evidence and, as discussed previously, no attempt by the state to use the evidence as proof that the defendant was criminally liable.

Furthermore, the case against the defendant was strong. The state presented evidence that the defendant discharged his shotgun in close proximity to the victim's head, thereby causing her injury. The victim, who was familiar with the defendant, unambiguously identified the defendant as the shooter both prior to and during the trial. The defendant urges us to conclude that there were reasons to doubt the victim's overall strength as a witness. Yet, there was evidence, apart from the victim's testimony, that the defendant was in Marina Village on the day of the shooting as well as evidence, apart from the victim's testimony, that he was acquainted with the victim and was, in fact, her drug supplier. This evidence provided a strong basis on which the finder of fact could conclude that the victim had not misidentified the perpetrator, but correctly identified a person with whom she was familiar.

In light of the evidence presented at trial, the isolated nature of the evidence of the defendant's silence, and the fact that the prosecutor did not in any manner use the evidence improperly, we conclude that any *Doyle* violation in this case was harmless beyond a reasonable doubt. Accordingly, we conclude that the defendant is unable to prevail under the third and fourth prongs of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] During closing argument, the prosecutor argued in relevant part: "And I direct your attention, ladies and gentlemen, to a letter, state's exhibit 4, which was admitted when Miss Unique Lopez testified. A letter, ladies and gentlemen, that was sent by this defendant to Miss Lopez as you were being selected for a jury. A letter imploring Miss Lopez not to come and testify."

[3] The record reflects that when the state filed its proposed list of witnesses on October 1, 2012, it did not identify Lopez as a potential state's witness. Nor did the state identify Lopez as a potential state's witness during jury selection on October 1 and October 2, 2012. The defendant's attorney identified a "Univa Lopez" as a potential defense witness during jury selection on October 1, 2012, and a "Unika Lopez" as a potential defense witness during jury selection on October 2, 2012. Between October 2, 2012, and October 4, 2012, the date on which the letter at issue was postmarked, it does not appear that the state disclosed publicly that it intended to call Lopez as a witness. Thus, the state reasonably suggests that only persons with intimate knowledge of trial matters would have been privy to the fact that following jury selection and prior to October 4, 2012, the state had decided to call Lopez as a witness and had made such disclosure to the defense.

[4] During the state's initial closing argument, the prosecutor stated in relevant part: "We also have, ladies and gentlemen, fact, there's been no evidence to refute that the defendant during [the] time period from the summer of 2011 and up until November of 2011 was selling drugs in Marina Village. How do we know that? We know that from Maria Guadalupe Upchurch, who came in here and told you quite frankly that that's how much she knew the defendant. She knew the defendant from purchasing drugs over a several month period. But we also know that from two other witnesses . . . that weren't directly harmed . . . by the defendant's actions in this case. And we know that by Unique Lopez, who came in here and reluctantly agreed

that when she spoke to the police approximately one week after [the crime occurred] she did tell them that the defendant, she knew the person as Rell, was a person who had been selling drugs in Marina Village. And we also know that, ladies and gentlemen, through Shaneeka Durham, who is the mother of the defendant's child, who was with the defendant in Marina Village on that day, on November 20, 2011. But she also through tears told us that the defendant would sell drugs at that location. Fact. No evidence to refute it whatsoever."

During the state's rebuttal closing argument, the prosecutor discussed factors related to an assessment of the victim's credibility. The prosecutor stated in relevant part: "She never got to her [step]father's that day, at least to help him. And so when you look at [her history of drug use], she doesn't deny that she used drugs before, she said she didn't remember [if she had used drugs the day prior to the shooting]. She's a drug user; she came in here and told you that, and that man is the drug seller, the drug seller who sold those drugs to Maria Guadalupe."

[5] Unpreserved prosecutorial impropriety claims are reviewable on appeal under *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). We note that, although the defendant has labeled the prosecutor's interrogation of witnesses and closing arguments as an improper attempt to attack his character, he does so merely in the context of his evidentiary claim. He has not presented this court with a claim that prosecutorial impropriety deprived him of his due process right to a fair trial. See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

[6] The record reveals that the shotgun and the shells found with the shotgun were introduced during Pomales' testimony. Pomales testified prior to Mercado and Cardona and, with regard to the anonymous witness, merely testified that Mercado had been in contact "with an anonymous caller who was giving him a description of a party that the firearm was handed to."

[7] For the reasons set forth in the foregoing *Golding* analysis, we likewise reject the defendant's argument that plain error exists. In light of the strength of the state's case and the role that the evidence at issue played in the context of the entire trial, we do not conclude that any error in its admission warrants a reversal of the judgment.

[8] During its charge, the court stated in relevant part: "I want to say a few comments about the telephone call that was played [for] you. The recording of a call allegedly made by the defendant was placed into evidence. The recording may be considered only as it may show a consciousness of guilt on the part of the defendant and for no other purpose. It is permissible in a criminal case for the state to show that conduct or statements made by a defendant after the time of an alleged offense were influenced by the criminal act; that is, the conduct or statements show a consciousness of guilt. Such statements do not raise a presumption of guilt. If you find the defendant made statements that were influenced by the crimes, you may, but are not required to, infer that he was acting from a guilty conscience."

[9] In his brief, the defendant refers in general terms to "the testimonial hearsay provided by Lavery," but his claim in substance is that the state failed to present a witness—unlike Lavery—who could have testified with regard to the method by which his telephone conversations were recorded and that such a failure deprived him of his right to confrontation.

[10] Although the defendant does not rely on *Montgomery* for this aspect of its holding, the court in *Montgomery* went on to conclude that the *Doyle* violation was harmless beyond a reasonable doubt. *State* v. *Montgomery*, supra, 254 Conn. 717–21.

[11] In his principal appellate brief, the defendant suggests that the prosecutor deliberately introduced the evidence at issue, stating: "Indeed, the prosecutor knew that [the defendant] only answered two questions [during the police interview], but proceeded to purposefully elicit additional testimony that he refused to answer any further questions." The defendant, without referring to any evidence in the record, characterizes the prosecutor's conduct in this manner, but he does not raise a claim of prosecutorial impropriety in this appeal.